

James P. Bonner (JB-0629)
Shalov Stone & Bonner LLP
485 Seventh Avenue
Suite 1000
New York, New York 10018
(212) 239-4340

Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK



JOSEPH JESNER, AMIR ABIZDRIS, EDNA
ABIZDRIS, ELI ABIZDRIS, HADAS ABIZDRIS, MEIR
ABIZDRIS, ELI ABIZDRIS, RINON ABIZDRIS,
ABIZDRIS, RACHEL ABIZDRIS, ZAHAVA
RUTH ABIZDRIS, YAAKOV ABIZDRIS, ZAHAVA
ABIZDRIS, DITZA ADARI, NISIM ADARI, AGDI
ADELVIET, ESTHER ADEREE, ARIK AFRI, FANI
AFRI, GAL AFRI, NETANEL AFRI, SAGI AFRI,
RUTH AGAM, YECHIA AHARON, YEHOSHOA
AKSAT, LILACH ALMAKIS, MOTTI AMIR, RAZIEL
AMIR, EYAL AMRAN, YARON AMSALEM,
HALLEL SHMUEL ANGELMAN, SARA ARAD,
ILYIA ARROSOV, DANNY ATIAS, MA'AYAN
AVIHUD, IDAN AVISIDRIS, ENRIKE AVRAHAM,
MEIR AVRAHAM, MOSHE AVRAHAM, ORNA
AVRAHAM, SIMCHE AVRAHAM, RITA AVRAMOV,
CHAYA AWAD, DANIEL AWAD, ZAHAVA AZANI,
ELIAHO AZIZI, REIN AZULAY, SHLOMI AZULAY,
YEHOSHOA BABILAN, SALACH NASIF BADER,
BRACHA BADICHI, ARAN BALASH, ITAMAR
BARAS, BORIS BARKAGAN, INESA BARKAGAN,
MANBER BARUCH, SIGAL BARUCH, SHIFRA
BECHER, ALEXANDER BELSKI, MAKSIM BELSKI,
SARA BEN AROYA, ELIYA BEN CHAMO, EDEN
TAL BEN CHAYIM, YITZHAK BEN DANIEL,
IFTACH BEN DAVID, NADAV BEN GAL, ERAN
BEN RECHAV, MIRI TUBOL BEN SHITRIT, AMI
BEN TZION, SHMUEL BEN TZION, YAIR BEN
TZION, YISRAEL BEN TZION, SHAI BEN TZUR,
MAYA BEN YISHAI, YUVAL BEN-SHIMOL,
YERUCHAM (YEHOSHUA) BERENSTEIN,
MENUCHA BERGER, ORIT BERGER, RIVKA
BERNEKOVSKY, ZVI BERNEKOVSKY, ANAT
BINENFIELD, AVI BINENFIELD, HAYA
BINENFIELD, MALI BINENFIELD, MAYA

**COMPLAINT**

NO. _____

POHORELSKY, M.J.

1

BINENFIELD, MOSHE BINENFIELD, SHABTAI
BINENFIELD, TZVIA BINENFIELD, LAYZI BITON,
GIDEON BLACK, VIVIAN BLACK, YOVAL
BLANKOVSKY, DAVID BOLOK, MORDECHAI
CHAFTZADI, NILI CHAFTZADI, NIR CHAFTZADI,
RAFFI CHANUM DAVID CHAY, SHULA CHAZAN,
EYAL KLIL CHORESH, HAIM CHOTER, ILIN
CHOTER, AMI COHEN, AMNON COHEN, ASAF
COHEN, AVITAL COHEN, BINYAMIN COHEN,
EILAT COHEN, ELIEZER COHEN, HAYA COHEN,
IDIT COHEN, MARGALIT COHEN, MICHAL
COHEN, MIRIAM COHEN, MOSHE COHEN, OFRA
COHEN, PARNASOA COHEN, RACHAMIM COHEN,
MAYA DAGAN, RACHEL DAGAN, SHLOMO
DAGAN, TOMER DAGAN, KOBI DAHAN, ZIBERT
DAHAN, ESTER DANON, OSHRAT DAVIKO, EINAT
DAYAN, ETTI DAYAN, GIL DAYAN, OPHIRA
DAYAN, RACHELI DAYAN, SHLOMO DAYAN,
JENNY COHEN DERFLER, YISRAEL DERI, ORI
DINNER, ALIZA EDRI, DANA EDRI, LIRON EDRI,
YITZAK EDRI, SHAI EIGNER, EIANIT EITCHER,
MIRYAM ELIAD, SHMUEL ELIAD, YELENA
ELIMELECH, HADAS EMANUEL, OHAD EPSTEIN,
ZOHAR EVYATAR, ANDREI FEDOTOV, AHARON,
FINK, DORON FINK, NORIT FINK, OFER FINK,
ZE'EV FISHFEDER, DEVORAH FISHMAN, YAEL
FISHMAN, ALIZA FRANKFURTER, ELIAV
FRANKFURTER, ESTI FRANKFURTER, MATANEL
FRANKFURTER, YAKIR FRANKFURTER, YOVAL
FRANKFURTER, MENACHEM FREIDMAN, DROR
FRIEBERG, TAMAR FRIEBERG, YEHUDIT
FRIEBERG, HADASA FRIEDMAN, HAIM
FRIEDMAN, TZIPORA FRIEDMAN, YEHUDI
FRIEDMAN, YONA FRIEDMAN, BLUMA FUGEL,
AMIR GAD, CHANA GAD, AVISHAI
GAMZOLETOVA, VICTOR GARSIA, YORAM
GDALYAHU, ELYASH GEHALI, CAMAL GHANEM,
MARSHA GLADSTONE, YAEL GLADSTONE, OMER
GOLAN, BATYA GOLDENBERG, DROR
GOLDENBERG, SHLOMO GOLDENBERG, SILVIA
GOLDSTEIN, OFIR GREENVALD, DVORAH
GROMAN, IDAN GUETA, DENNIS GUSHCHIN,
GALINA GUSHCHIN, VLADIMIR GUSHCHIN, INES
HAIM, ESTER HAIZLER, JOSHUA HAIZLER, YAFFA
HALLELUIAN, LIMOR HANANYA, YOEL
HANANYA, NIR HAREL, ABIGAIL HASID, DANIEL

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

HASID, DORON HASID, DVIR HASID, EITZIK
HASID, MICHAL HASID, ORLY HASID, OVADIA
HASID, RONI HASID, TOMER HASID, TZVIA
HASID, YEHUDA HASID, YISHIAYA HASID,
YA'ARA HAYADID, CHANA HEFETS, IDO HELER,
INBAL HENDLER, AVRAHAM HENIG, ARNAUD
HERENSTEIN, ASAF HERSHKOVITZ, DOR
HERSHKOVITZ, GEULA HERSHKOVITZ, HILA
HERSHKOVITZ, REI HERSHKOVITZ, SAGIT
HERSHKOVITZ, SHVUT HERSHKOVITZ, YASMIN
HERSHKOVITZ, BELLA HIMANKO, BASARA
HINAWE, TIMOR HORSANOV, CHEZI HUSHI, LIOR
HUSHI, MOSHE HUSHI, ORIT HUSHI, ARI JESNER
JARED JESNER, ERAN JORNO, ELIEZER KALFON,
VERED KANIMAT, CHEN KARMI, MOSHE KASHI,
DAN KASPRAS, ALON KATZ, REUVEN KATZ,
SARA KEISAR, RON KEYNAN, ARIEH KIKIS,
MARGARET KIKIS, YURI KIKIS, DAVID KIMCHI,
HAYA KIMCHI, YOCHANAN KIMCHI, MAYA
KNAFO, SHARON KNAFO, AVIVA KOMEMI,
RACHAMIM KOMEMI, VLADIMIR KORGANOV,
CHAYIM KUTCHER, GABRIELLE KUZECKI,
DAVID LAUFER, LEAH LAUFER, NACHUM
LAUFER, YAFA LEVI, SHARON LEVINGER, ADI
LEVY, AMOS LEVY, ARYE LEVY, HENIA LEVY,
HILA LEVY, IRIS LEVY, LIMOR LEVY, MAZAL
LEVY, RAMMI LEVY, YA'AKOV YADID LEVY,
YAMIT LEVY, YOSEF LEVY, NATAN MAALIMI,
ALEXANDER MAIYSTER, YOSEF MALACHI,
MACHLUF MALKA, MEIR YAIR MALKA, ADI
MANIR, ESTHER MANZUR, SHIFRA MARGALIOT,
YEHUDA MARIAN, MANOYAL MARKOS, VIOLET
MASLUSH, RUBIN MAZAL, NIR MECHAV, ALEX
MELAMED, NISIM MENACHEM, ZEHAVA
MENACHEM, AVIA MENAHEM, LEE MENAHEM,
LIOR MENAHEM, MAZAL MENAHEM, NURIT
MENAHEM, CHANA MILLER, DAVID MIMRAN,
ORA MINTZ, YOAV MINTZ, HAGIT MISHALI,
TAMIR MOSHE MISHALI, AMIT MIZRACHI, AVI
MIZRACHI, DAYLA MIZRACHI, ERAN MIZRACHI,
MOSHE MIZRACHI, ORI MIZRACHI, AVRAHAM
MORDECHAI, DALIT MORDECHAI, DANIEL
MORDECHAI, DIKLA MORDECHAI, ESTER
MORDECHAI, IRIYA MORDECHAI, MAAYAN
MORDECHAI, MEYTAL MORDECHAI, NIRIT
MORDECHAI, YAEL MORDECHAI, TAMAR

MOSHE, MENACHEM MOSHKOVITZ, RAVIT
MOSTAKI, AVRAHAM NAIM, SHARON NATAF,
YIFTACH NATIV, ESTER NEGARI, SHACHAR
NEGARI, SHAI NEGARI, SHELI NEGARI, TUVIA
NEGARI, BEN TZION NEMET, FLORA NEMET,
SHIRA NEMET, IRIT HAR NOY, ADAR OFRI,
AVISHAG OFRI, HUVA OFRI, MATANEL OFRI,
NADAV OFRI, JULY OHAYUN, NECHAMA OLY,
SASON OLY, AYAL ORBACH, ELIYAHU OREN,
MIRIAM OZAN, KOLIEV PAIK, SARA PALBANI,
YONA PARZON, ASAF PASSI, NITZCHIA PELEG,
SHIRLEY PELEG, YOSSI PELEG, SHABTAI PENSO,
SHLOMO PEREL, AVICHAI PERETZ, ELI PERETZ,
ESATE OF NELLY PEROV, YELENA PEROVA, RON
PERSKY, MICHAELI PINCHAS YISRAEL PINCHASI,
BORIS PISKAROV, GUY POLAK, ROEI POLTOV,
SHOSHANA PORTAL, YA'AKOV PRESEROVITZ,
YOSEPH PRIEL, VERED PRIMOR, KORMAN RAMI,
AYALA RAPAD, ELAD RAPAD, HALLEL RAPAD,
HODAYA RAPAD, SHIRA RAPAD, EFRAT RAVID,
ELI RAVIVO, HAREL REIN, TATIANA ROBINOV,
AVIV RONEN, MORDECHAI RONES, NATANEL
RONI, GAD ROSENWALD, DAVID ROSMAN,
ELIZABETH ROSMAN, AVI ROSTHSTEIN, AVIVA
ROSTHSTEIN, CHEN ROSTHSTEIN, IDIT
ROSTHSTEIN, MOSHE ROZENTZVEIG, SHOSHI
ROZENTZVEIG, MENACHEM ROZENTZVIEG,
ADRA RUND, AYA RUND, HAYA RUND, OREN
RUND, YOSSI RUND, MOSHE SA'ADA, LEAH
SABAN, MIRIAM SABAN, YOEL SABAN, SARAH
EDEN SALAM, ROMI-HOMA SALOMON, MASHA
SANDLAR, BEN TZION SCHIJVESCHUURDER,
HAYA SCHIJVESCHUURDER, LEAH
SCHIJVESCHUURDER, MEIR
SCHIJVESCHUURDER, SHAMUEL
SCHIJVESCHUURDER, AVNER SHAHAR, HAIM
SHALOM, NIRA SHALOM, SHULA SHALOM, GILA
SHAMBIK, SHIMON SHAMBIK, BORIS SHAPIRA,
ASHER SHARON, DINA SHAUL, LEIL SHAUL,
YECHEZKEL SHAUL, MEGDALIN SHAVI, LINDA
SHAVIT, YELENA SHAYSER, YONA SHEFER,
GOLSONDA SHIMASHVILY, SIMON
SHIMASHVILY, ZELMAN SHLOMO, EINBAL
SHOMRON, YISRAEL SHRAIBER, URI SHUSAYOV,
RACHEL SHWARTZMAN, YAAKOV
SHWARTZMAN, YONATAN SHWARTZMAN, DORI

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

SHWIER, MAYA SIGAL, ITZIK SIKRON, CHAIM
SILVIA, MENACHEM SIMCHI, HERZELIYA
SIMCHON, KEREN SIMCHON, LIOR SIMCHON,
MOSHE SIMCHON, ROI SIMCHON, SHANI
SIMCHON, SHARON SIMCHON, AMIL SITVON,
ADIEL SOUDRY, IZMINI SOVTZOGLO MEIR
SWISA, RAFAEL TABADI, ADEL TARCHOV,
NAFTALI TARCHOV, AVARHAM TENNENBAUM,
SARA TENNENBAUM, LINDA YARDEN TIMSIT,
SHLOMO TIMSIT, SHACHAR TIRI, SHOSHANA
TIRI, RIKKI TORBATI, YOSSI TOTI, BOAZ TUBOL,
LEAH TUBOL, YOVAL TUBOL, DANA TURGEMAN,
ESTER TURGEMAN, SHALOM TURGEMAN, TAL
TURGEMAN, ZIV TURGEMAN, DAVID TZAFRIR,
SHIMON TZUBARI, AVITAL TZUR, MATAN TZUR,
SOUL EVEN TZUR, EYAL TZVITMAN, ORA
TZVITMAN, ALEXANDRA USATINSKY, SERGEI
USATINSKY, ZOYA USATINSKY, ZIVA VAGAN,
LINDA VAKIL, SHLOMO VAKIL, YARDEN VAKIL,
URIEL VAKNIN, BARUCH VASERMAN,
ALEXANDER VASILEV, HELENA VEISENBERG,
AMIR VELKOVICH, DOV VELTZER, SARA
VELTZER, RUCHAMA BEN YOSEF VEZANA ILAN
WEINBERGER, DAVID WEINER, ESTER WEINER,
MICHAEL WEINER, ORLY WEINER, YISHAHAYAU
WISNER, ANAT YADID, BAT SHEVA YAMINI
DALYA (TOVA) YARKONY, YASMIN YAZDI,
FACHIMA YEKUT, AMI YIFRACH, BOAZ
YISHAYAHU, LIORA YITZHAK, ILAN
YITZHAKIAN, TATIANA YUDALEVITZ, DAVID
YULAZRI, DUDI YULAZRI, HADASA YULAZRI,
LINOR YULAZRI, MOSHE YULAZRI, ELAD
ZABINSKI, HELEN ZABINSKI, ABIGAIL ZAGRON,
BENNI ZAGRON, EIDIT ZAGRON, HAYUTA
ZAGRON, VARDA ZAGRON, YASMIN ZAGRON,
MOSHE ZAGURI, DANIEL ZAMIR, LEAH ZAMIR,

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

MORIA ZAMIR, MAAYAN ZOHAR, DAVID          :
ZUKERMAN, EILAT ZUKERMAN, RACHAELI      :
ZUKERMAN, RONI ZUKERMAN, TALIA          :
ZUKERMAN, YOCHAI ZUKERMAN,             :
                                      :

          Plaintiffs,                 :
                                      :

   - against-                       :
                                      :

ARAB BANK, PLC,                     :
                                      :

          Defendant.               :

---

Plaintiffs Joseph Jesner, Amir Abizdris, Edna Abizdris, Eli Abizdris, Hadas Abizdris, Meir Abizdris, Rachel Abizdris, Rinon Abizdris, Ruth Abizdris, Yaakov Abizdris, Zahava Abizdris, Ditza Adari, Nisim Adari, Agdi Adelviet, Esther Aderee, Arik Afri, Fani Afri, Gal Afri, Netanel Afri, Sagi Afri, Ruth Agam, Yechia Aharon, Yehoshoa Aksat, Lilach Almakis, Motti Amir, Raziel Amir, Eyal Amran, Yaron Amsalem, Hallel Shmuel Angelman, Sara Arad, Ilyia Arrosov, Danny Atias, Ma'ayan Avihud, Idan Avisidris, Enrike Avraham, Meir Avraham, Moshe Avraham, Orna Avraham, Simche Avraham, Rita Avramov, Chaya Awad, Daniel Awad, Zahava Azani, Eliaho Azizi, Rein Azulay, Shlomi Azulay, Yehoshoa Babilan, Salach Nasif Bader, Bracha Badichi, Aran Balash, Itamar Baras, Boris Barkagan, Inesa Barkagan, Manber Baruch, Sigal Baruch, Shifra Becher, Alexander Belski, Maksim Belski, Sara Ben Aroya, Eliya Ben Chamo, Eden Tal Ben Chayim, Yitzhak Ben Daniel, Iftach Ben David, Nadav Ben Gal, Eran Ben Rechav, Miri Tubol Ben Shitrit, Ami Ben Tzion, Shmuel Ben Tzion, Yair Ben Tzion, Yisrael Ben Tzion, Shai Ben Tzur, Maya Ben Yishai, Yuval Ben-Shimol, Yerucham (Yehoshua) Berenstein, Menucha Berger, Orit Berger, Rivka Bernekovsky, Zvi Bernekovsky, Anat Binenfield, Avi Binenfield, Haya Binenfield, Mali Binenfield, Maya Binenfield, Moshe Binenfield, Shabtai Binenfield, Tzvia Binenfield, Layzi Biton, Gideon Black, Vivian Black,

Yoval Blankovsky, David Bolok, Mordechai Chaftzadi, Nili Chaftzadi, Nir Chaftzadi, Raffi Chanum David Chay, Shula Chazan, Eyal Klil Choresh, Haim Choter, Ilin Choter, Ami Cohen, Amnon Cohen, Asaf Cohen, Avital Cohen, Binyamin Cohen, Eilat Cohen, Eliezer Cohen, Ilaya Cohen, Idit Cohen, Margalit Cohen, Michal Cohen, Miriam Cohen, Moshe Cohen, Ofra Cohen, Parnasoa Cohen, Rachamim Cohen, Maya Dagan, Rachel Dagan, Shlomo Dagan, Tomer Dagan, Kobi Dahan, Zibert Dahan, Ester Danon, Oshrat Daviko, Einat Dayan, Etti Dayan, Gil Dayan, Ophira Dayan, Racheli Dayan, Shlomo Dayan, Jenny Cohen Derfler, Yisrael Deri, Ori Dinner, Aliza Edri, Dana Edri, Liron Edri, Yitzak Edri, Shai Eigner, Eianit Eitcher, Miryam Eliad, Shmuel Eliad, Yelena Elimelech, Hadas Emanuel, Ohad Epstein, Zohar Evyatar, Andrei Fedotov, Aharon, Fink, Doron Fink, Norit Fink, Ofer Fink, Ze'ev Fishfeder, Devorah Fishman, Yael Fishman, Aliza Frankfurter, Eliav Frankfurter, Esti Frankfurter, Matanel Frankfurter, Yakir Frankfurter, Yoval Frankfurter, Menachem Freidman, Dror Frieberg, Tamar Frieberg, Yehudit Frieberg, Hadasa Friedman, Haim Friedman, Tzipora Friedman, Yehudi Friedman, Yona Friedman, Bluma Fugel, Amir Gad, Chana Gad, Avishai Gamzoletova, Victor Garsia, Yoram Gdalyahu, Elyash Gehali, Camal Ghanem, Marsha Gladstone, Yael Gladstone, Omer Golan, Batya Goldenberg, Dror Goldenberg, Shlomo Goldenberg, Silvia Goldstein, Ofir Greenvald, Dvorah Groman, Idan Gueta, Dennis Gushchin, Galina Gushchin, Vladimir Gushchin, Ines Haim, Ester Haizler, Joshua Haizler, Yaffa Halleluian, Limor Hananya, Yoel Hananya, Nir Harel, Abigail Hasid, Daniel Hasid, Doron Hasid, Dvir Hasid, Eitzik Hasid, Michal Hasid, Orly Hasid, Ovadia Hasid, Roni Hasid, Tomer Hasid, Tzvia Hasid, Yehuda Hasid, Yishiaya Hasid, Ya'ara Hayadid, Chana Hefets, Ido Heler, Inbal Hendler, Avraham Henig, Arnaud Herenstein, Asaf Hershkovitz, Dor Hershkovitz, Geula Hershkovitz, Hila Hershkovitz, Rei Hershkovitz, Sagit Hershkovitz, Shvut Hershkovitz, Yasmin Hershkovitz, Bella Himanko, Basara Hinawe,

Timor Horsanov, Chezi Hushi, Lior Hushi, Moshe Hushi, Orit Hushi, Ari Jesner Jared Jesner, Eran Jorno, Eliezer Kalfon, Vered Kanimat, Chen Karmi, Moshe Kashi, Dan Kaspras, Alon Katz, Reuven Katz, Sara Keisar, Ron Keynan, Arieh Kikis, Margaret Kikis, Yuri Kikis, David Kimchi, Haya Kimchi, Yochanan Kimchi, Maya Knafo, Sharon Knafo, Aviva Komemi, Rachamim Komemi, Vladimir Korganov, Chayim Kutcher, Gabrielle Kuzecki, David Laufer, Leah Laufer, Nachum Laufer, Yafa Levi, Sharon Levinger, Adi Levy, Amos Levy, Arye Levy, Henia Levy, Hila Levy, Iris Levy, Limor Levy, Mazal Levy, Rammi Levy, Ya'akov Yadid Levy, Yamit Levy, Yosef Levy, Natan Maalimi, Alexander Maiyster, Yosef Malachi, Machluf Malka, Meir Yair Malka, Adi Manir, Esther Manzur, Shifra Margaliot, Yehuda Marian, Manoyal Markos, Violet Maslush, Rubin Mazal, Nir Mechav, Alex Melamed, Nisim Menachem, Zehava Menachem, Avia Menahem, Lee Menahem, Lior Menahem, Mazal Menahem, Nurit Menahem, Chana Miller, David Mimran, Ora Mintz, Yoav Mintz, Hagit Mishali, Tamir Moshe Mishali, Amit Mizrachi, Avi Mizrachi, Dayla Mizrachi, Eran Mizrachi, Moshe Mizrachi, Ori Mizrachi, Avraham Mordechai, Dalit Mordechai, Daniel Mordechai, Dikla Mordechai, Ester Mordechai, Iriya Mordechai, Maayan Mordechai, Meytal Mordechai, Nirit Mordechai, Yael Mordechai, Tamar Moshe, Menachem Moshkovitz, Ravit Mostaki, Avraham Naim, Sharon Nataf, Yiftach Nativ, Ester Negari, Shachar Negari, Shai Negari, Sheli Negari, Tuvia Negari, Ben Tzion Nemet, Flora Nemet, Shira Nemet, Irit Har Noy, Adar Ofri, Avishag Ofri, Huva Ofri, Matanel Ofri, Nadav Ofri, July Ohayun, Nechama Oly, Sason Oly, Ayal Orbach, Eliyahu Oren, Miriam Ozan, Koliev Paik, Sara Palbani, Yona Parzon, Asaf Passi, Nitzchia Peleg, Shirley Peleg, Yossi Peleg, Shabtai Penso, Shlomo Perel, Avichai Peretz, Eli Peretz, Esate of Nelly Perov, Yelena Perova, Ron Persky, Michaeli Pinchas Yisrael Pinchasi, Boris Piskarov, Guy Polak, Roei Poltov, Shoshana Portal, Ya'akov Preserovitz, Yoseph Priel, Vered Primor, Korman Rami, Ayala Rapad,

Elad Rapad, Hallel Rapad, Hodaya Rapad, Shira Rapad, Efrat Ravid, Eli Ravivo, Harel Rein, Tatiana Robinov, Aviv Ronen, Mordechai Rones, Natanel Roni, Gad Rosenwald, David Rosman, Elizabeth Rosman, Avi Rosthstein, Aviva Rosthstein, Chen Rosthstein, Idit Rosthstein, Moshe Rozentzveig, Shoshi Rozentzveig, Menachem Rozentzvieg, Adra Rund, Aya Rund, Haya Rund, Oren Rund, Yossi Rund, Moshe Sa'ada, Leah Saban, Miriam Saban, Yoel Saban, Sarah Eden Salam, Romi-Homa Salomon, Masha Sandlar, Ben Tzion Schijveschuurder, Haya Schijveschuurder, Leah Schijveschuurder, Meir Schijveschuurder, Shamuel Schijveschuurder, Avner Shahar, Haim Shalom, Nira Shalom, Shula Shalom, Gila Shambik, Shimon Shambik, Boris Shapira, Asher Sharon, Dina Shaul, Leil Shaul, Yechezkel Shaul, Megdalin Shavi, Linda Shavit, Yelena Shayser, Yona Shefer, Golsonda Shimashvily, Simon Shimashvily, Zelman Shlomo, Einbal Shomron, Yisrael Shraiber, Uri Shusayov, Rachel Shwartzman, Yaakov Shwartzman, Yonatan Shwartzman, Dori Shwier, Maya Sigal, Itzik Sikron, Chaim Silvia, Menachem Simchi, Herzeliya Simchon, Keren Simchon, Lior Simchon, Moshe Simchon, Roi Simchon, Shani Simchon, Sharon Simchon, Amil Sitvon, Adiel Soudry, Izmini Soytzoglo Meir Swisa, Rafael Tabadi, Adel Tarchov, Naftali Tarchov, Avarham Tennenbaum, Sara Tennenbaum, Linda Yarden Timsit, Shlomo Timsit, Shachar Tiri, Shoshana Tiri, Rikki Torbati, Yossi Toti, Boaz Tubol, Leah Tubol, Yoval Tubol, Dana Turgeman, Ester Turgeman, Shalom Turgeman, Tal Turgeman, Ziv Turgeman, David Tzafrir, Shimon Tzubari, Avital Tzur, Matan Tzur, Soul Even Tzur, Eyal Tzvitman, Ora Tzvitman, Alexandra Usatinsky, Sergei Usatinsky, Zoya Usatinsky, Ziva Vagan, Linda Vakil, Shlomo Vakil, Yarden Vakil, Uriel Vaknin, Baruch Vaserman, Alexander Vasilev, Helena Veisenberg, Amir Velkovich, Dov Veltzer, Sara Veltzer, Ruchama Ben Yosef Vezana Ilan Weinberger, David Weiner, Ester Weiner, Michael Weiner, Orly Weiner, Yishahayau Wisner, Anat Yadid, Bat Sheva Yamini Dalya (Tova) Yarkony,

Yasmin Yazdi, Fachima Yekut, Ami Yifrach, Boaz Yishiayahu, Liora Yitzhak, Ilan Yitzhakian,
Tatiana Yudalevitz, David Yulazri, Dudi Yulazri, Hadasa Yulazri, Linor Yulazri, Moshe Yulazri,
Elad Zabinski, Helen Zabinski, Abigail Zagron, Benni Zagron, Eidit Zagron, Hayuta Zagron,
Varda Zagron, Yasmin Zagron, Moshe Zaguri, Daniel Zamir, Leah Zamir, Moria Zamir, Maayan
Zohar, David Zukerman, Eilat Zukerman, Rachaeli Zukerman, Roni Zukerman, Talia Zukerman,
Yochai Zukerman, by their attorneys, allege the following upon information and belief:

## NATURE OF THE ACTION

1.     This Complaint is brought by terror victims for damages to hold Defendant
accountable for its violations of the laws of the United States and international law. Defendant
Arab Bank has knowingly and willfully conspired with and aided and abetted HAMAS and other
foreign terrorist organizations in their terror campaigns against innocent civilians in Israel and in
so doing violated well established, recognized norms of international law. Plaintiffs are all non-
United States citizens who are victims of terror attacks which occurred in Israel during the
Second Intifada, as described below.

## INTRODUCTION

2.     The acts giving rise to this action are the result of a systematic and widespread
campaign of suicide bombings and other murderous attacks that have been authorized, directed
and/or committed by the Islamic Resistance Movement ("Hamas"), the Palestinian Islamic Jihad
("PIJ"), the Al-Aqsa Martyrs' Brigade ("AAMB"), and the Popular Front for the Liberation of
Palestine ("PFLP") – all of whom have been listed for years by the United States Department of
the Treasury as Specially Designated Global Terrorists ("SDGTs") and also have been designated
by the United States Department of State as foreign terrorist organizations ("FTOs"). The

Popular Resistance Committees ("PRC"), which was headed by Jamal Abu Samhadana until his death on June 8, 2006, has also committed numerous terror attacks in Israel, especially near and around the Gaza Strip during the period from September 2000 until the present.   PRC has committed a number of attacks at the request of and in coordination with Hamas and Hezbollah.

3.      Arab Bank plc ("Arab Bank") has knowingly and substantially assisted these terrorist organizations and directly and indirectly provided them with material support.

4.      This civil action is brought on behalf of victims of this latest surge of Palestinian terror, which has been accomplished with the complicity of Arab Bank.  It is brought by foreign nationals who are the heirs and close family members of those killed along with those foreign nationals injured by the terrorist attacks carried out in violation of the laws of nations, United States' statutes, and general federal common law.  The claims herein are brought pursuant to the Alien Tort Claims Act, 28 U.S.C. § 1350.

5.      Plaintiffs bring this action in furtherance of (i) policies of the United States and the rest of the world which universally condemn acts of genocide, crimes against humanity, international terrorism, and the financing of international terrorism; (ii) Congress's intent to compensate victims of such acts and assure that support for them shall not be a cost-free undertaking, and (iii) the will of the international community to hold accountable all persons who financially aid, or otherwise provide material support to, violations of the law of nations including, but not limited to, genocide, crimes against humanity, international terrorism, and the financing of international terrorism.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §
1331, and 28 U.S.C. § 1350, as a civil action arising under the laws of the United States and one
brought by aliens for a tort only, committed in violation of the law of nations.

7.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(d).

8.     Arab Bank is subject to personal jurisdiction in the Eastern District of New York
pursuant to N.Y. CLPR § 301 because, among other things, it continuously and systematically
does business in the State of New York.  Arab Bank also is subject to personal jurisdiction in the
State of New York pursuant to N.Y. CPLR § 302 because, based on the facts alleged herein and
upon information and belief, Arab Bank (a) transacts business within the State of New York; (b)
contracts to supply goods and services in the State of New York; (c) has committed tortious acts
within the State of New York; and (d) has committed tortious acts outside the State of New York
causing injury within the State of New York and (i) derives substantial revenue from goods used
or consumed in the State of New York or (ii) expected or should reasonably have expected such
acts to have consequences in the State of New York and derived substantial revenue from
international commerce.  Defendant engaged in continuous, permanent and substantial activity in
New York and the United States.

## THE PARTIES AND THE TERROR ATTACKS THAT INJURED OR KILLED THEM

### A.     Plaintiffs

9.     All of the Plaintiffs named herein are citizens of Israel unless otherwise noted.
All of the Plaintiffs are "aliens suing for torts only" within the meaning of the Alien Tort Claims
Act.  All of the persons mentioned in this section of the Complaint and listed in the caption are
Plaintiffs in this lawsuit.  There are a total of 525 Plaintiffs.  There were approximately 118 terror

attacks that occurred between September 2000 and December 2005 that harmed these Plaintiffs.

The terrorist attacks in which the Plaintiffs were injured involved the following facts and

circumstances:

**February 25, 2005:** Abdalla Sa'id Ibrahim Badran, from the Tulkarem region, blew himself up at the entrance of The Stage nightclub on the Tel-Aviv promenade. PIJ was responsible for this suicide bombing. The bombing killed 5 people, including Yael Orbach, age 28 from Rehovot, Israel, and injured over 50 others. The injured included three members of the Frieberg family, Dror Frieberg, 29, Yehudit Frieberg, 26, and Tamar Frieberg, 25, as well as Limor Hananya and her husband Yoel Hananya and Eran Jorno. Surviving family members of Yael Orbach, deceased, that join as Plaintiffs are her mother, Helen Zabinski, brother, Elad Zabinski, and husband, Ayal Orbach.

**January 13, 2005:** Shortly before the closing of the Karni Crossing, terrorists activated an explosive device on the Palestinian side of the crossing, blowing a hole in the door through which Palestinian terrorists infiltrated the Israeli side of the crossing and opened fire at Israeli civilians. As a result of the explosion and exchanges of fire, six Israeli civilians were killed, and five Israeli civilians were wounded. Hamas and the AAMB claimed joint responsibility for the attack. Ofer Tiri, 23, of Ashkelon was killed, and Plaintiff Moshe Zaguri was injured. Surviving family members of Ofer Tiri, deceased, that join as Plaintiffs are his mother, Shoshana Tiri, and his brother, Shachar Tiri.

**September 22, 2004:** A female AAMB suicide bomber, Zeinab Abu Salem, blew herself up near a crowded bus stop at a northern Jerusalem junction near French Hill, killing Menashe Komemi, 19, of Moshav Aminadav, and injuring 14 people, including Plaintiffs Eliahu Azizi, of Jerusalem, and Nitzchia Peleg, of Ofra. Surviving family members of Menashe Komemi, deceased, that join as Plaintiffs are his parents, Aviva and Rachamim Komemi.

**August 31, 2004:** Hamas carried out two suicide bombings within minutes of each other on two Beersheba city buses, killing 16 people and wounding over 100, including Plaintiffs Ziva Vagan, Manber (Yaffa) Baruch, Eliyahu Oren, Michal Cohen, and Danny Atias. The homicide bombers were Nassim Muhammad Ali Abd al-Ghani Ja'bari and Ahmed Abu al-Afu Abd al-Fatah Qawasmeh, who had been recruited by Mus'ab Hashlamun, head of the Hamas cell in northern Hebron.

**July 19, 2004:** Salach Nasif Bader, 22, was wounded in the head by Palestinian terrorists during a shooting attack at Kfar Tzuda near Tulkarem, injuring the left side of his brain and seriously affecting the right side of his body.

**July 18, 2004:** Dan Kaspras and Yiflach Nativ both suffered injuries during a drive-by shooting attack on Road 505. The attack was carried out by Palestinian terrorists.

**July 11, 2004:** Liora Yitzhak and Yelena Shayser were wounded in a bus bombing in downtown Tel Aviv which occurred at about 7 A.M. AAMB claimed responsibility for the terror attack. Liora suffered severe shrapnel injuries and other physical injuries that required surgery and have continued to cause her to have difficulty walking.

**June 28, 2004:** Hamas terrorists fired a Kassam rocket in the Gaza Strip near a nursery school in the northern Negev town of Sderot. Daniel Awad, 6, and his mother, Chaya Awad, were both wounded in the attack. A 4 year old and an adult were killed in the terror attack.

**March 22, 2004:** Ravit Mostaki and Gad Rosenwald were seriously injured when they were stabbed by Palestinian terrorists in Ramat Gan. Gad is permanently disabled.

**March 14, 2004:** Hamas and the AAMB claimed joint responsibility for dual suicide attacks at the Ashdod port that killed 10 and injured 16, including Yosef Levy, Romi-Homa Salomon, and Alexander Maiyster.

**March 4, 2004:** Yoval Blankovsky, 27, was riding in a car when it was riddled with bullets fired by Palestinian terrorists. Yoval was injured and suffered severe emotional distress and psychological harm.

**February 22, 2004:** Muhammad Issa Khalil Zaghal, who was affiliated with the AAMB, committed a suicide bombing of a No. 14 bus in Jerusalem. This terror attack killed 8 people, including Benaya Zukerman, age 18, from Jerusalem, Yaffa Ben-Shimol Matlub, age 57, and Ilan Israel Avisidris, age 38. The attack also injured Asaf Cohen, Amos Levy, and Boris Piskarov. Surviving family members of the deceased that join as Plaintiffs for the wrongful death of Benaya Zukerman include his mother, Eilat Zukerman, and his siblings: Rachaeli, Roni, Talia, David, and Yochai Zukerman. (Moshe Zukerman, Benaya's father, is a plaintiff in the *Almog* case on file in this Court.) Also joining as Plaintiffs are: Yuval Ben-Shimol, the son of Yaffa Ben-Shimol, deceased; Shoshana Portal, the wife of Illan Avisidris; and her son, Idan Avisidris.

**January 29, 2004:** An AAMB suicide bomber (Ali Munir Yussuf Jaarah of Bethlehem) blew himself up on a Jerusalem Egged bus #19, killing 11 people and wounding 44 others, including Esther Aderee, Yitzhak Ben Daniel, Sara Keisar, Itamar Baras, Ilyia Arrosov, and Victor Garsia. Both AAMB and HAMAS claimed responsibility for the terror attack.

**January 18, 2004:** Nine-year-old Ron Oly, of Moshav Bar Giyora, suffered head injuries and lost an eye in a stone throwing attack near Kfar Hason. The attack was carried out by Palestinian terrorist groups. Sason and Nechama Oly, the parents of Ron Oly, also join as Plaintiffs.

**January 14, 2004:** A female suicide bomber from Gaza City, Reem Saleh Mustafa Awad (Al-Riyashi), sponsored by both Hamas and AAMB/Fatah/Tanzim, detonated a bomb at the Erez Crossing in the Gaza Strip killing, 4 Israelis and wounding Reuven Katz.

**December 25, 2003:** A suicide bombing attack by Sa'id (Tha'ir) Kamal Jamil Hanani, at the Geha Junction, east of Tel Aviv near Petah Tikva, killed Rotem Weinberger, age 19, and

wounded Hadas Emanuel and Shula Shalom. The attacked killed three other Israelis and injured many more. The PFLP claimed responsibility for the terror attack. Ilan Weinberger, father of Rotem Weinberger, deceased, joins as a Plaintiff for his daughter's wrongful death. The Estate of Rotem Weinberger, deceased, and Rotem's mother are named in the *Almog* case on file in this Court.

**November 18, 2003:** A Palestinian terrorist opened fire with an AK-47 assault rifle hidden in a prayer rug at a checkpoint on the tunnel bypass road linking Jerusalem and the Gush Etzion bloc, killing 23-year-old Shlomi Slavik Belski.   AAMB claimed responsibility for the attack. Surviving family members of Shlomi Slavik Belski, deceased, that join as Plaintiffs are Alexander Belski, his father, and Maksim Belski, his brother.

**September 9, 2003:** A Hamas suicide bomber, Ramez Fahmi Izz al-Din Abu Salim, attacked Café Hillel, a popular coffee shop in the heart of Jerusalem's German Colony. The suicide bomber was stopped by a security guard as he approached the café. The terrorist was able to detonate the explosive, blowing in the windows on the main street and killing 7 people, including David S. Abizdris, age 51, and Gila Moshe, age 40, and injuring over 50, including Plaintiffs Shai Ben Tzur, Adiel Soudry (who is now permanently disabled and has had to have part of his intestines surgically removed) and Ma'ayan Avihud.   Surviving family members of David Abizdris, deceased, who join as Plaintiffs for his wrongful death are his mother, Rachel Abizdris, former wife, Hadas Abizdris, children, Amir, Rinon, and Ruth Abizdris, and siblings, Chana Hefets and Yaakov, Eli, Meir, Zahava, and Edna Abizdris. Also joining through his next friend and mother, Hagit Mishali, is David's son, Tamir Moshe Mishali. Surviving family members of Gila Moshe, deceased, who join as Plaintiffs for her wrongful death are her parents, Moshe and Simcha Avraham, and her siblings, Meir and Orna Avraham. (Gila's husband, Boaz, and their children, Safir and Nir, are plaintiffs in the *Almog* case on file in this Court.)

**September 9, 2003:** A Hamas suicide bomber, Ihab 'Ab al-Kadir Mahmoud Abu Salim, committed a suicide bomb attack at a hitchhiking post in Tzirifin, killing Efrat Shwartzman, 19, and Jonathan Peleg, 19, along with 9 others. Surviving family members that join as Plaintiffs are Yossi Peleg and Shirley Peleg, the father and sister of Jonathan Peleg, deceased. Also joining for the wrongful death are Yaakov and Rachel Shwartzman, the parents of Efrat Shwartzman, and Yonatan Shwartzman, the brother of Efrat Shwartzman, deceased.

**August 19, 2003:** A Hamas suicide bomber, Raid 'Abd al-Hamid 'Abd al-Rizaq Musk, dressed as an orthodox Jew boarded a No. 2 Egged bus in Jerusalem and detonated himself, killing 23 people, including Mordechai Laufer, 27, and Liba Shwartz Tafilinski, age 54. The bombing also seriously injured over 100 people, including, Chaim Silvia, Haya Kimchi and her sons David and Yochanan Kimchi, Ami Ben Tzion and his sons Shmuel, Yisrael, and Yair Ben Tzion, Sara Palbani, and Bluma Fugel. Surviving family members that join as Plaintiffs for the wrongful deaths are Dvorah Groman, daughter of Liba Shwartz, deceased; David and Leah Laufer, parents, and Nachum Laufer, brother, of Mordechai Laufer, deceased.

**August 12, 2003:** Masha Sandlar was seriously injured in the Rosh Haayin supermarket suicide bomb attack carried out by a Palestinian terrorist, Islam Yussuf Taleb Kteshat. Fatah/Tanzim was responsible for the terror attack.

**July 15, 2003:** Amir Simchon, 24, of Bat Yam was killed when a Palestinian armed with a long-bladed knife stabbed Amir on Tel Aviv's beachfront promenade. Surviving family members that join as Plaintiffs are Moshe and Herzeliya Simchon, parents, and Keren, Sharon, Roi, Shani, and Lior Simchon, siblings of Amir Simchon, deceased. AAMB claimed responsibility for the terror attack.

**July 7, 2003:** A PIJ terrorist, Ahmad Khiri Fathi Yehia, entered a home in Kfar Yavetz and blew himself up with a bomb. Nadav and Huva Ofri and their children Adar, Avishag, and Matanel were seriously injured in the terror attack. The terror attack also wounded Bat Sheva Yamini.

**June 17, 2003:** Shmuel and Miryam Eliad were both injured in a shooting attack near the Kibbutz Eyal junction on the Trans-Israel Highway. The terrorist fired from the outskirts of the West Bank city of Kalkilya. AAMB and the Popular Front for the Liberation of Palestine - General Command claimed responsibility for the terror attack.

**June 11, 2003:** A Hamas suicide bomber detonated himself on Egged bus # 14 in Jerusalem, killing 17 people, including Tzvika Cohen and Elza Cohen, and wounding Itzik Sikron, Natan Maalimi, and Inesa Barkagan and her daughter, Daniella Barkagan, 11. Inesa Barkagan is now paralyzed as a result of the attack. Surviving family members of Tzvika Cohen, deceased, that join as Plaintiffs are his parents, Binyamin and Haya Cohen, and his siblings, Amnon, Ofra, Ami, Eliezer, and Miriam Cohen. Tzvika's wife, Chana Cohen, is a party to the *Almog* case on file in this Court. Surviving family members of Elza Cohen, deceased, that join as Plaintiffs are her daughter, Margalit Cohen. The father and grandmother of Daniella Barkagan that join as Plaintiffs are Boris Barkagan and Yelena Elimelech.

**June 5, 2003:** The bodies of David Shambik, 26 of Jerusalem and Moran Menachem, 17 of Jerusalem, were found near Hadassah Ein Karem Hospital in Jerusalem, brutally beaten and stabbed to death. The attack was carried out by Palestinian terrorists. Surviving family members of David Shambik, deceased, that join as Plaintiffs are Gila and Shimon Shambik. Surviving family members that also join as Plaintiffs are Nisim and Zehava Menachem, parents of Moran Menachem, deceased.

**May 19, 2003:** A female PIJ suicide bomber, Hiba 'Azem Sa'id Daraghmeh, blew herself up at the Amakim Shopping Mall in Afula, killing 3 people and injuring Meir Swisa, 21 and Tatiana Robinov, 28.

**May 18, 2003:** A 19 year old Hamas suicide bomber from Hebron, Bassem Jamal Darwish al-Takrouri, exploded himself on the No. 6 Egged bus near French Hill in Jerusalem. 7 people were killed, including Shimon Usatinsky and Nelli Perov. Surviving family members that join as Plaintiffs are Yelena Perova and Andrei Fedotov, children of Nelli Perov, deceased and Alexandra Usatinsky, wife, and Zoya and Sergei Usatinsky, children of Shimon Usatinsky, deceased.

114176 v1                                    16

**April 24, 2003:** Ohad Epstein, 21, was injured in the Kfar Saba train station suicide bombing attack committed by Ahmad Khaled Muhammad Ridha Khatib, an 18 year old from near Nablus. AAMB and PFLP claimed joint responsibility for the terror attack.

**April 15, 2003:** A Palestinian terrorist (Muhammad Muhammad Khanil Yunis) carried explosives, grenades and a gun opened fire at the Karni industrial zone crossing in the Gaza Strip, injuring Litach Almakis. Hamas claimed responsibility for the attack.

**March 30, 2003:** A PIJ suicide bomber, Rami Muhammad Jemil Mutlaq Ghanem, detonated himself at the entrance of the London Café in Netanya, injuring over 50 people, including Plaintiffs Zohar Evyatar, her son Maayan Zohar, Ron Persky, Iftach Ben David, and Sigal Baruch.

**March 5, 2003:** A Hamas suicide bomber, Muhammad 'Umran Salim Qawasmeh, attacked an Egged bus #37 on Moriah Blvd. in the Carmel section of Haifa, en route to Haifa University, killing 15 Israeli civilians and wounding Soul Even Tzur and Izmini Sovtzoglo.

**January 12, 2003:** Nadav Ben Gal was wounded when terrorists infiltrated Moshav Gadish and opened fire. The Islamic Jihad claimed responsibility for the attack.

**January 5, 2003:** Two terrorist suicide bombers (Buraq Rifat 'Abd al-Rahman Khalifa and Samir 'Imad Muhammad al-Nouri) detonated themselves on the pedestrian mall near the old Bus Station in Tel-Aviv, killing 23 people including Sapira Yulazri and Moris Arfi. The attacks also seriously injured Menachem Simchi, Avi Mizrachi, Yaffa Halleluian, Rafael Tabadi, Chayim Kutcher, Chen Karmi, and David Bolok. The attack was carried out by two members of AAAMB, with the help of PIJ. Surviving family members that join as Plaintiffs are Moshe, Dudi, Linor, Hadasa, and David Yulazri, family of Safira Yulazri, deceased, and Fani, Arik, Netanel, Sagi, and Gal Arfi, and Esther Manzur, children of Moris Arfi.

**December 27, 2002:** Gavriel Choter, 17, a religious student from Alonei Habashan, was killed during a shooting attack while he was working in the Otniel Yeshiva kitchen, serving a Shabbat meal to 100 students in the adjacent dining room.    2 terrorists from Dura, near Hebron, committed the terror attack. Asaf Passi was wounded in the same attack.    PIJ claimed responsibility for the attack.  Surviving family members that join as Plaintiffs are Ilin and Haim Choter, parents of Gavriel Choter, deceased.

**November 21, 2002:** A Hamas suicide bomber (Na'il 'Azmi Musa Abu Halil) detonated an explosive belt on the No. 20 Egged bus on Mexico Street in Jerusalem. 11 Israelis were killed, and several others were injured, including schoolchildren who filled the bus, as well as Yamit Levy, who was 6 months pregnant at the time, and her 8-year-old daughter, Hila Levy, Bella Himanko, and Agdi Adelviet.

**November 15, 2002:** PIJ militants opened fire and threw hand grenades at a crowd of Jewish worshippers and their security guards as they were walking home from Sabbath prayers at the Cave of the Patriarchs near Hebron. The attack killed 12, including David Markos, 20, and Alex Tzvitman, 20, and wounded 15, including Alon Katz. PIJ claimed responsibility for the attack.

Surviving family members that join as Plaintiffs are Manoyal Markos, father of David Markos, deceased, and Ora Tzvitman, wife, and Eyal Tzvitman, son, of Alez Tzvitman, deceased.

**November 6, 2002:** A Palestinian terrorist opened fire in a hothouse and textile factory at Pe'at Sadeh in the southern Gaza Strip, which wounded Elyash Gehali. The terrorist was killed by a security officer. HAMAS claimed responsibility for the terror attack.

**October 27, 2002:** A Hamas suicide bomber (22 year old Muhammad Feisal Bustami from Nablus) blew himself up at a Sonol gas station at the entrance to Ariel killing 3 people, including Amihud Hasid and Matan Zagron, 22, who tried to stop the suicide bomber and took the brunt of the explosion. Others were wounded in the terror attack, including Layzi Biton. Surviving family members that join as Plaintiffs are wife, Orly Hasid; children, Dvir, Daniel, Michal, Doron, and Tomer Hasid; and siblings, Tzvia, Ovadia, Yishiaya, Eitzik, Yehuda, Roni, and Abigail Hasid, of Amihud Hasid, deceased. Uri Shusayov, 27 was also injured. Varda and Benni Zagron, parents, and Abigail, Eidit, Hayuta, and Yasmin Zagron, sisters of Matan Zagron, deceased join as Plaintiffs for the wrongful death.

**October 21, 2002:** Two PIJ suicide bombers from Jenin (Muhammad Hasanin and Ashraf Salah Ahmad al-Asmar) drove a jeep containing approximately 100 kilograms of explosives up to a No. 841 Egged at a bus stop which had been traveling along Wadi Ara on Route No. 65 towards Hadera, and exploded. 14 people were killed including Sharon Tubol, 19, and 50 others were wounded including Plaintiffs Fachima Yekut, Idan Gueta, and Enrike Avraham. Surviving family members that join as Plaintiffs are Leah Tubol, mother, and Yoval and Boaz Tubol and Miri Tubol Ben Shitrit, siblings of Sharon Tubol, deceased.

**October 10, 2002:** A Hamas suicide bomber, Rafik Muhammad 'Ali 'Abd al-Rahman Hamad, age 31 from Qalqilya, blew himself up trying to get aboard Dan bus no. 87 across from Bar Ilan University in Tel Aviv killing Sara (Sa'ada) Aharon from Ramat Gan. Surviving family members that join as Plaintiffs for the wrongful death are Yechia Aharon, husband, and Yona Parzon, daughter, of Sara (Sa'ada) Aharon, deceased.

**October 9, 2002:** Eliezer Kalfon was injured in a terrorist road shooting attack at Ziv junction, near Hebron which killed 1 person and injured several others.

**September 19, 2002:** A Hamas suicide bomber (Iyad Na'im Subhi Radad from Ramallah) detonated an explosives-laden bag on the No. 4 bus on Allenby Street in downtown Tel Aviv, killing 6 people, including Yonatan Jesner, a 19 year old citizen of the UK, Salomon Henig, and Yafa Shem Tov Chantin, 47, and injuring over 70 other individuals, including Megdalin Shavi, Shabtai Penso, Gideon Black, a citizen and resident of the United Kingdom who witnessed the death of his cousin and best friend, Yonatan Jesner, Yehoshoa Babilan, Nisim Adari, whose husband, Ditza, was later injured in a terrorist stone throwing attack in July 2002, and Ya'ara Hayadid, 48. Surviving family members that join herein for the wrongful deaths are Joseph Jesner, father of Yonatan Jesner, deceased, and his brothers Ari Jesner and Jared Jesner. Also Marsha Gladstone, Yonatan Jesner's mother and his sisters, Yael Gladstone and Gavriela Kuzecki and Yonatan's grandmother, Vivian Black, join as Plaintiffs. The Jesner, Gladstone and Black families are citizens of the UK Also joining are Avraham Henig, son of Salomon Henig,

deceased; and Raffi Chanun, brother of Yafa Shem Tov Chanun, deceased.

**August 10, 2002:** Yafit Herenstein, age 31, was killed and her husband, Arnaud Herenstein, was seriously injured when a terrorist entered their house and attacked them with a gun at the Mechora village in the Jordan Valley. The couple's two daughters - Shai aged two-and-a-half and Hen aged four months - were safely extracted from the home during a gun battle with the terrorist, who was killed by soldiers. Only Arnaud Herenstein is named as a Plaintiff in this case seeking recovery for the injuries and damages he sustained in the attack as well as for the mental anguish and pain and suffering as a result of seeing the attack and his wife's death. The family of Yafit Herestein is named in the *Almog* case on file in this Court.

**August 4, 2002:** A 20 year old Hamas suicide bomber from near Nablus (Jihad Khaled Hamada) detonated an explosive device strapped to his body while on a bus traveling near Mt. Meron in northern Israel. 9 Israeli civilians were killed including Roni Ghanem, 28 from Mughar and Mordechai Yehuda Friedman, 24 from Beit Shemesh and 48 civilians were wounded including Dori Shwier, Menachem Rozentzvieg, Aviv Ronen, Yisrael Shraiber, and Yerucham (Yehoshua) Berenstein. Surviving family members that join as Plaintiffs are Camal Ghanem, father of Roni Ghanem and Yehudi Friedman, wife, and Menachem and Tzipora Friedman, children of Mordechai Yehuda Friedman. Parents of Menachem Rozentzveig that join as Plaintiffs are Moshe and Shoshi Rozentzveig.

**July 31, 2002:** A bomb planted by Hamas operatives exploded in the Frank Sinatra Student Center on the Hebrew University's Mt. Scopus campus in Jerusalem, killing 9 people and severely wounding Maya Sigal, who lost her right eye, and Yona Shefer, who has undergone significant surgery and rehabilitation.

**July 16, 2002:** Hamas terrorists attacked the No. 189 Dan bus traveling from Bnei Brak to Emmanuel in the West Bank. The terrorists detonated an explosive charge next to the bus while terrorists disguised in IDF uniforms waited in ambush and opened fire on the bus. Four terrorist organizations claimed responsibility for the coordinated attack. The terror attack was carried out by the same Hamas cell that perpetrated a similar attack on Emmanuel on December 12, 2001. 9 people were killed in the attack, including Zilpa Kashi, age 65 from Givataim, her son-in-law Gal Shilon, 32, and her granddaughter Tiferet Sara Shilon, 8 months. Ayelet Shilon, Zilpa Kashi's daughter and mother of Tiferet Sara Shilon, was seriously injured in the attack, along with Inbal Hendler, who is currently paralyzed in the face. Surviving family members that join as Plaintiffs include Moshe Kashi, husband of Zilpa Kashi, father of Ayelet Shilon and grandfather of Tiferet Sarah Shilon. Inbal Hendler joins as a Plaintiff to this action to recover for her injuries. Ayelet Shilon and the family of Gal Shilon are plaintiffs in the *Almog* case on file in this Court.

**June 19, 2002:** A suicide bomber (Sayid Waddah Hamid Awada) blew himself up at a crowded bus stop at the French Hill intersection in northern Jerusalem. 7 people were killed in the terror attack, and over 36 others were injured including Avital Tzur, Eliya Ben Chamo, 19, and Sara Arad. AAMB/Tanzim claimed responsibility for the terror attack.

**June 18, 2002:** A Hamas suicide bomber (Muhammad Haza' 'Abd al-Rahman al-Ghoul)

detonated an explosives filled bag on a Egged bus no. 32A traveling along Dov-Yosef Street in the Gilo neighborhood of Jerusalem at the Patt Junction. 19 civilians were killed, including Rafael Berger, age 28, and Shiri Negari, age 22. Adi Manir was seriously injured in the attack. Surviving family members that join as Plaintiffs are Orit Berger, wife of Rafael Berger, deceased, and Ester and Tuvia Negari, parents, and Sheli, Shai, and Shachar Negari, siblings, of Shiri Negari, deceased.

**June 11, 2002:** A Hamas suicide bomber (Imad Muhammad Ahmad Ziadeh) blew up at the entrance to a restaurant in Herzliya, killing one person and injuring 15 people, including Ruth Agam and Shimon Tzubari.

**June 8, 2002:** Two terrorists infiltrated an Israeli settlement near Bethlehem before dawn. The terrorists opened fire killing a man and his 9 month pregnant wife. Shalom Mordechai was mortally wounded attempting to capture the terrorists. HAMAS claimed responsibility for the terror attack. Surviving family members who join as Plaintiffs for this wrongful death are Yael and Avraham Mordechai, parents of Shalom Mordechai, deceased.

**June 6, 2002:** Erez Rund, 18 of Ofra, was killed in a shooting attack by terrorists near Kfar Sangil. The attack was committed by Hamar Russam Salim Rimawi of AAMB. Erez died of gunshot wounds to the chest. Erez had been a counselor in the Bnei Akiva youth movement for two years. Surviving family members that join as Plaintiffs for this wrongful death are Haya Rund, mother, Yossi Rund, father, who was shot himself in a terror attack in January 2002, and Odra, Oren, and Aya Rund, siblings of Erez Rund, deceased.

**June 5, 2002:** A PIJ suicide bomber (Hamzah 'Aref Hassan Samudi from Jenin) drove a car packed with a large quantity of explosives into a No. 830 Egged bus at Megiddo Junction near Afula. The bus, which burst into flames, was completely destroyed. The terror attack killed 17 people including Sivan Weiner, age 19 from Holon and Shimon Timsit and wounded Sharon Levinger, Meytal Mordechai, and Guy Polak. Surviving family members that join as Plaintiffs are Ester Weiner, mother, and David, Michael, and Orly Weiner, siblings of Sivan Weiner and Shlomo and Linda Yarden Timsit, parents of Shlomo Timsit, deceased.

**May 27, 2002:** An AAMB/Tanzim suicide bomber (Jihad Ibrahim Saud Titi) detonated himself near an ice cream parlor outside a shopping mall in Petah Tikva, killing 3 people and injuring 28 other individuals, including Avraham and Sara Tennenbaum. Violet Maslush was also wounded in the suicide bombing attack.

**May 22, 2002:** Mazal Levy, 42, was injured in the Tanzim/Fatah suicide bombing attack in Rishon Letzion that killed 2 people and injured 35 others. The terrorist was Issa 'Abd Rabo Ibrahim Badir.

**May 19, 2002:** A PIJ suicide bomber (Osama 'Adel Ahmad Bushkar) disguised as a soldier, blew himself up in the market in Netanya, killing 3 people and injuring Ofir Greenvald, 18.

**May 7, 2002:** A Hamas suicide bomber (Muhammad Jamil Ahmad Mua'mar) detonated an explosive belt and an additional explosive device, carried in a bag, at a pool hall in Rishon

Lezion. 15 Israeli civilians were killed, including Nawa Hinawi, age 51 from Tel Aviv and Rafael Haim, age 64 from Tel Aviv. Several others were injured in the terror attack including Yafa Levi, Ron Keynan, Tamar Moshe, Shifra Becher, and Shula Chazan. Surviving family members who join as Plaintiffs for this wrongful death are Basara Hinawe, son of Nawa Hinawi, deceased and Ines Haim, wife of Rafael Haim.

**April 12, 2002:** A female suicide bomber ('Andalib Khalil Muhammad Suliman Tqatqa) from AAMB/Tanzim blew herself up at a bus stop on Jaffa Road at the entrance to Jerusalem's Mahane Yehuda open-air market, killing 6 people including, Rivka Fink age 77, and seriously wounding over 100 people, including Moshe Cohen, Boris Shapira, Yoram Gdalyahu, Bracha Badichi, Ester and Joshua Haizler and Yehuda Marian. Surviving family members that join as Plaintiffs for this wrongful death are Moshe Hushi, husband, and Lior, Chezi, and Orit Hushi and Rikki Torbati, children of Sohilia Hushi, deceased and Norit, Doron, Aharon, and Ofer Fink, siblings of Rivka Fink.

**April 10, 2002:** A Hamas suicide bomber (Raghab Ahmad 'Izzat Jaradat) blew himself up on a No. 960 Egged bus en route from Haifa to Jerusalem. The explosion occurred near Kibbutz Yagur, east of Haifa, and killed 8 people, and wounded 17 other individuals including Yehoshoa Aksat and Ruchama Ben Yosef Vezana.

**March 29, 2002:** Tuvia Wisner, 79, of Petah Tikva was stabbed to death while on his way to the synagogue for morning prayers, when a Palestinian terrorist infiltrated the Neztarim settlement in the Gaza Strip. Tuvia had been staying for the Passover holiday with his son Hanan and his family who are residents of Netzarim. He was killed along with another guest who was also visiting family. A resident who had left the synagogue discovered them lying on the ground and immediately alerted the community's doctor and security officials. The two were taken in a ambulance to Soroka Hospital but died en route. Surviving family members that join as Plaintiffs for the wrongful death are Yishahayau Wisner, son of Tuvya Wisner, deceased.

**March 29, 2002:** Terrorists invaded the home of David Mimran in the Golan Heights of Israel and attacked him with a knife. He was stabbed 16 times, but managed to survive the terror attack.

**March 27, 2002:** A Hamas suicide bomber ('Abd al-Basset Muhammad Odeh) walked into the dining room of The Park Hotel in Netanya, Israel where 250 guests had just sat down to begin the Passover seder and detonated an large explosive device killing 22 people immediately and injured 140, 8 of whom subsequently died from their injuries. Those killed include Yehudit Korman, Eliezer Korman, Dvora Karim, and Michael Karim. Those injured include Dov Veltzer (83), Sara Veltzer (84), Sara Ben Aroya, Zvi Bernekovsky, Rivka Bernekovsky, Motti Amir, Raziel Amir (9), Esti Frankfurter (16), Yoval Frankfurter (6), Yakir Frankfurter (10), Eliav Frankfurter (14), Aliza Frankfurter (37), and Matanel Frankfurter (12). The surviving family members of Yehudit and Eliezer Korman that join as Plaintiffs for the wrongful death are their children, Korman Rami and Menucha Berger. The surviving family member of Michael Karim that joins as a Plaintiff is his brother Michaeli Pinchas.

**March 20, 2002:** A PIJ suicide bomber (Rafat Tahsin Salim Najib Abu Diyak) boarded an 823

bus traveling from Tel Aviv to Nazareth and blew himself up at the Musmus Junction near Afula, killing and injuring several people. Those killed included Shimon Edri age 20, Alon Goldenberg, age 28, and Aharon Ravivo, age 19. Yossi Toti (22) was injured. Surviving family members of Shimon Edri that join as Plaintiffs for the wrongful death are his parents, Yitzhak and Aliza Edri, and his siblings, Liron and Dana Edri. The surviving family members of Alon Goldenberg that join as Plaintiffs are his parents, Batya and Shlomo Goldenberg, and his brother, Dror Goldenberg. Eli Ravivo, father of Ehron Ravivo, joins as a Plaintiff herein. PIJ and the AAMB both claim responsibility for the attack, but the PIJ infrastructure in Jenin headed by Thabet Mardawi was responsible for the attack.

**March 9, 2002:** A Hamas suicide bomber (Fuad Ismail Ahmad al-Hurani) detonated an explosive device strapped to his body at the entrance to Cafe Moment in the heart of Jerusalem. 11 Israeli civilians were killed in the terror attack, including Danit Dagan, age 24 from Tel Aviv, and 25 others were injured including Irit Har Noy, Efrat Ravid, Oshrat Daviko, and Shlomi Azulay. Surviving family members that join as Plaintiffs for this wrongful death are Rachel and Shlomo Dagan, parents, and Tomer and Maya Dagan, siblings, of Danit Dagan, deceased.

**March 9, 2002:** A 9 months old baby and another person were killed and about 50 people were injured, several seriously, when two Palestinians opened fire and threw grenades at cars and pedestrians in the Israeli coastal city of Netanya close to the city's boardwalk and hotels. AAMB claimed responsibility for the terror attack. 5 members of the Rapad family, Ayala, 45, Hallel, 15, Shira, 18, Hodaya, 16, and Elad, 22, who were visiting the Jeremy Hotel, were injured in the terror attack.

**March 7, 2002:** A Hamas gunman invaded a training academy in Atzmona and killed 5 Israeli teenagers and seriously wounded Eyal Klil Choresh and Ori Dinner, 21.

**March 7, 2002:** Terrorists attacked the Hotel Eshel HaShomron near Ariel junction causing emotional and psychological pain and suffering to Tatiana Yudalevitz (34) of Ariel. PFLP was responsible for the terror attack.

**March 5, 2002:** Devorah Friedman, 45, of Efrat, was killed in shooting attack on the Bethlehem bypass "tunnel" road, south of Jerusalem while driving to work in Jerusalem with her husband Yona Friedman at about 8:15 A.M. The couple was ambushed by a Palestinian terrorist near the Al-Khader junction. The terrorists fired 15 bullets at the passenger car. Devorah was mortally wounded and her husband was injured in the attack. AAMB claimed responsibility for the attack. Surviving family members that join as Plaintiffs for the wrongful death are Yael Fishman, sister of Devorah Friedman, deceased.

**March 3, 2002:** Eran Gad, 24, of Rishon Letzion was one of 10 soldiers and civilians killed when a terrorist opened fire at an IDF roadblock north of Ofra in the West Bank. Shortly after 6:30, a Palestinian sniper opened fired at an army roadblock 1.5 kilometers north of Ofra on the Ramallah-Nablus road killing 10 soldiers and civilians and wounding four, before escaping unharmed. With his first shots, the gunman killed the three soldiers deployed behind concrete blocks surrounding the roadblock. Soldiers sleeping in the adjacent building were alerted by the gunfire and raced out to the roadblock, only to be shot dead. Also killed were civilians and

soldiers who arrived by car at the roadblock. Those killed include Yitzhak Didi of Hadera (66) and Eran Gad (24) of Rishon Letzion. The surviving family members of Yitzhak Didi that join as Plaintiffs for this wrongful death are her niece, Rubin Mazal and her sibling Amil Sitvon. The surviving family members of Eran Gad that join as Plaintiffs are Chana Gad, mother and Amir Gad, brother. The Fatah Al-Aqsa Martyrs Brigade claim responsibility for the attack.

**March 2, 2002**: The bullet-ridden body of Jerusalem police detective Chief-Supt. Moshe Dayan, 46, of Ma'aleh Adumim, was discovered next to his motorcycle near the Mar Saba Monastery in the Judean Desert. Tanzim/AAMB claimed responsibility for the terror attack. Family members that joins as Plaintiffs for this terror attack are Etti Dayan, wife, Ophira Dayan, daughter, Einat Dayan, daughter and Gil Dayan, son.

**March 2, 2002**: A AAMB/Tanzim suicide bomber (Muhammad Ahmad 'abd al-Rahman Daraghmeh) blew himself up near a group of worshippers who had just left a synagogue in the Beit Yisrael neighborhood in the center of Jerusalem. Racheli and Shlomo (39) Dayan of Rishon Leizon were injured in the terror attack.

**February 21, 2002**: Palestinian terrorists opened fire at the Baka al Garbia roadblock injuring Ya'akov Preserovitz (23) of Raanana. Yaakov was shot in the chest, both legs and suffered a hand injury.

**February 19, 2002**: Erez Turgeman, 20, of Jerusalem was one of six soldiers killed in a terrorist attack near a roadblock west of Ramallah. Several terrorists opened fire at soldiers at the roadblock, including three off-duty soldiers inside a structure at the roadblock, killing them at point-blank range. The attack took place at about 9 P.M. Two or three Palestinian terrorists opened simultaneous fire at the outpost from different directions. Six people were killed, including three at point-blank range. Those killed included Erez Turgeman (20) of Jerusalem and Beni Kikis (20) of Karmiel. The surviving family members of Erez Turgeman who join as Plaintiffs are Esther, Shalom, Tal, Dana, and Ziv Turgeman. The surviving family members of Beni Kikis that join as Plaintiffs are Margaret, Yuri, and Arieh Kikis. AAMB claimed responsibility for the terror attack.

**February 16, 2002**: A PFLP suicide bomber (Sadeq 'Ahid Mahmoud 'Abd al-Hafez) blew himself up at the shopping mall in Karnei Shomron, injuring several people including Vered Kaninat (18) of Ginot Shomron, Yarden Vakil (13) of Karnei Shomron, Liel Shaul (10) of Karnei Shomron, and Moria Zamir (17) of Einav. Moria Zamir suffers paralysis of her left arm. Parents of Yarden Vakil who join as Plaintiffs are Shlomo and Linda Vakil. Parents of Liel Shaul who join as Plaintiffs are Yechezkel and Dina Shaul. Parents of Moria Zamir who join as Plaintiffs are Leah and Daniel Zamir.

**February 10, 2002**: Aya Malachi, 18 of Moshav Ein Habesor, was one of two female soldiers killed in a drive-by terrorist shooting at the entrance to a base in Be'er Sheva. In the early afternoon, at about 13:30, two terrorists opened fire at the entrance to the base. Aya Malachi, and another young woman, who were in the bakery across from the base, were mortally injured and died in the hospital shortly afterwards. Four others were injured, one critically. One of the terrorists was killed at the scene; the second, wearing an explosives belt, fled in the direction of a

nearby school when he was shot and killed by a soldier and police officer. Hamas claimed responsibility for the terror attack. Surviving family members that join as Plaintiffs for the wrongful deaths are Yosef Malachai, father of Aya Malachi, deceased.

**January 27, 2002:** An AAMB female suicide bomber (Wafa' Ali Khalil Falyfel (Idris), armed with more than 10 kilograms of explosives blew herself up on Jaffa Road, in the center of Jerusalem, killing one person and injuring 90. The injured include Eilat Cohen of Jerusalem, Avner Shahar (61) of Jerusalem, and Ester Danon (40) of Jerusalem.

**January 12, 2002:** Palestinian terrorists opened fire from an ambush seriously injuring Yossi Rund, 53. His son, Erez Rund, was later killed in another terrorist shooting attack in June 2002.

**December 12, 2001:** Three terrorists from Hamas and AAMB attacked a No. 189 Dan bus and several passenger cars with a roadside bomb, anti-tank grenades, and light arms fire near the entrance to Emmanuel at 18:00 P.M. 10 people were killed and about 30 were injured; one subsequently died of his wounds. The three terrorists belong to a Hamas cell operating out of Nablus. Bus 189 was traveling to Emmanuel from Bnei Brak. About a kilometer north of the settlement, three terrorists who were lying in wait on a hillside overlooking the road exploded two bombs that had been planted earlier, causing a great deal of damage. Some of the passengers were killed instantly. The bus continued driving for another few hundred meters, at which point passengers began trying to escape. At that point, one of the terrorists came down from the hill and began throwing hand grenades and shooting at the fleeing passengers. The other two terrorists also shot at the passengers, from the hillside. More people were wounded or killed by this shooting, including some of the occupants of three private cars that were traveling near the bus. The terrorists also shot at the rescuers who were trying to evacuate the wounded. 10 Israeli civilians were killed, including Yirmiyahu Salem, Yoel Binenfeld, 36, and Esther Avraham, 42, and more are wounded, including Hadasa Friedman and Haim Friedman. Surviving family members who join as Plaintiffs for these wrongful death are Boaz Yishiayahu, brother of Ester Avraham, deceased; Tzvia and Shabtai Binenfield, parents, and Moshe, Avi, Anat, Haya, Mali, and Maya Binenfield, siblings, of Yoel Binenfield, deceased; and Sarah Eden Salam, wife of Yirmiyahu Salam, deceased.

**December 2, 2001:** A Hamas suicide bomber (Maher Muhi al-Din Kamal Hebesha) detonated an explosive device concealed under a coat on a No. 16 Egged bus near Yad L'banim in Haifa's lower city. 15 civilians were killed and more than 40 other persons were injured, including Einbal Shomron, 22, who is now disabled and suffered severe emotional distress from the attack. Meir Yair Malka, 46, was also seriously injured in the attack and is completely disabled. Meir's father, Machluf Malka, 72, suffered severe burns in the attack and lives in a vegetative state attached to a ventilator. HAMAS and the PIJ claimed responsibility for the attack.

**December 1, 2001:** Two Hamas suicide bombers (Osama Muhammad 'Id Baher and Nabil Muhammad Jamil Halbiyyah) detonated bombs concealed in bags as well as explosive belts on Ben Yehudah Pedestrian Mall in the heart of Jerusalem. Immediately afterwards, a booby-trapped car exploded. 11 civilians were murdered in this terror attack including, Moshe Michael Dahan, age 20, Yoni Korganov, 20, Moshe Yadid Levy age 19, and 170 people were injured. The injured include two members of the Mizrachi family, Eran, 19, and Avi, 19. Eran Mizrachi

suffered extremely serious injuries and was thought to be dead at the scene of the bombing. He was brought back to life and was hospitalized for the next 18 months. Also injured in the triple bombing attack, Uriel Vaknin, Eianit Eitcher, 28, Roi Poltov, July Ohayun (citizen of Paris, France), Amir Velkovich, Leah Saban, 21, Nir Chaftzadi, 19, and his parents Nili and Mordechai Chaftzadi, Eden Tal Ben Chayim, Sharon Knafo, 28, and Vered Primor.  Surviving family members that join as Plaintiffs include Anat Yadid and Ya'akov Yadid Levy, parents of Moshe Yadid Levy, deceased, Vladimir Korganov, father of Yoni Korganov, deceased, and Zibert Dahan, father of Moshe Michael Dahan, deceased.  Yoel and Miriam Saban, the parents of Leah Saban, also join as Plaintiffs,

**November 27, 2001:** Two people were killed when two Palestinian terrorists from the Jenin area opened fire with Kalashnikov assault rifles on a crowd of people near the central bus station in Afula.  The two terrorists began firing near the bus station, then moved towards the market, firing in all directions as they went.  The two gunmen were chased by policemen and soldiers and were eventually killed.  Maya Knafo, 23, was injured in the terrorist shooting attack near the bus station.  More than 50 people were injured in the attack, for which both the PIJ and AAMB claimed to be responsible.  Maya Knafo suffers injuries to her leg and emotional harm.

**November 4, 2001:** A Palestinian terrorist opened fire with a sub-machine gun on a No. 25 Egged bus at the French Hill junction in northern Jerusalem.  Two teenagers were killed and 45 people were injured in the attack, including Sharon Nataf and Rein Azulay, 67.

**November 2, 2001:** Raz Mintz, 19, of Kiryat Motzkin was killed by Palestinian gunmen at 5:45 at an IDF roadblock near Offra, north of Ramallah.  St.-Sgt. Raz Mintz was manning the roadblock together with two other soldiers when Palestinians drove up and opened fire, then fled in the direction of Ein Yabrud.  Mintz was shot in the chest form the side, despite wearing a bulletproof vest.  AAMB claimed responsibility for the attack.  Surviving family members that join as Plaintiffs are Yoav and Ora Mintz, parents of Raz Mintz, deceased.

**October 28, 2001:** Four women were killed when two Palestinian terrorists, members of the Palestinian police, opened fire from a vehicle on Israeli pedestrians at a crowded bus-stop in downtown Hadera.  The terrorists spotted a crowd of people waiting at the bus stop and opened fire with automatic rifles.  Sima Menahem was killed in this terror attack.  44 other people were wounded., including Yisrael Pinchasi, 66, who was driving in his car when two terrorists opened fire on him and crashed into him.  Yisrael Pinchasi was hospitalized and has suffered physical and emotional injuries because of the terror attack.  Surviving heirs and close family members of Sima Menahem, deceased that join as Plaintiffs are the mother of Sima, Mazal Menahem, her sister, Nurit Menahem and her 3 daughters, Lior, Avia and Lee Menahem.

**October 7, 2001:** Yair Mordechai, 43, was killed in a PIJ suicide bombing attack near his home on an Israeli kibbutz when a Palestinian suicide terrorist (Ahmed Abd al-Mun'em Ahmed Daraghmeh) detonated a large bomb.  Surviving family member that join as Plaintiffs include Iriya Modechai, wife, and Daniel, Dikla, Ester, Maayan, and Nirit Mordechai, children of Yair Mordechai, deceased.

**September 9, 2001:** A Hamas suicide bomber (Sheikh Muhammad Shaker Salah Hebesha) blew

himself up near the Nahariiya train station in Northern Israel. Three people were killed and some 90 others were injured in the terror attack. Those killed include, Dr. Yigal Goldstein, 47 from Jerusalem, Morel Derfler, 45, and Daniel Yifrach, 19. The injured included: Ido Heler, 21, who suffers shrapnel injuries, burns, and hearing loss; Nir Harel, 27, who suffers injuries to his ears, shrapnel injuries in his leg, and several burns in his face and hands; and Eran Ben Rechav, 28, who suffers severe injuries and damaged hearing. Surviving family members that join as Plaintiffs are Jenny Cohen Derfler, wife of Morel Derfler, deceased; Ami Yifrach, father of Daniel Yifrach, deceased; Silvia Goldstein, wife of Yigal Goldstein, deceased.

**August 21, 2001:** Ori Mizrachi, 61, was shot in the chest when a terrorist gunman attacked the Mizrachi home in Jerusalem. The bullet is still lodged in Ori Mizrachi's body and he suffers nerve problems in his hands, trouble sleeping, and cannot work. The terror attack was committed by terrorists shooting rifles from Beit Jalla.

**August 9, 2001:** A Hamas suicide bomber (Izz al-Din Shuheil Ahmed al-Masri) blew himself up at the Sbarro pizzeria restaurant located on the corner of King George Street and Jaffa Road in the center of Jerusalem. 15 Israelis were killed including, Lili Shimashvily, 33, Tamara Shimashvily, 8, Giyora Balash, 60, Mordechai Schijveschuurder, 43, Tzira Schijveschuurder, 41, Ra'aya Schijveschuurder, 14, Avraham Schijveschuurder, 4, and Chemda Schijveschuurder, 2. More than 100 were wounded in the attack, including: Shira Nemet, 19, who suffers broken legs, broken hands, severe burns, shrapnel injuries, and is permanently disabled; Menachem Moshkovitz, 27, who suffers severe physical injuries to his head and legs as well as emotional distress; Chana Miller, 22, who suffers injuries to her leg and continues to suffer psychological and emotional harm as a result of the attacks; Golsonda and Simon Shimashvily, parents, and Linda Shavit, sister, of Lili Shimashvily. The children of Moredechai and Tzira Schijveschuurder who were killed join as Plaintiffs for the wrongful death of their parents and siblings. They are: Ben Tzion, Meir, Shamuel, Haya, and Leah Schijveschuurder. Also joining as Plaintiffs are Aran Balash, son of Giyora Balash, deceased. The parents of Shira Nemet also join as Plaintiffs. They are Ben Tzion and Flora Nemet.

**July 24, 2001:** Yuri Gushchin, 18, of Jerusalem, was murdered by terrorists in Ramallah. PFLP was responsible for the terror attack that killed Yuri Gushchin. Surviving family members that join as Plaintiffs for his wrongful death are Galina and Vladimir Gushchin, parents, and Dennis Gushchin.

**July 16, 2001:** A PIJ suicide bomber (Nidal Ibrahim Mustafa Abu Shaduf) blew himself up near the Binyemina train station, killing 2 and injuring 9, including Kobi Dahan, 26, who suffers physical and emotional harm, including hearing damage.

**July 11, 2001:** Ditza Adari, 43, was injured in a stone throwing attack by Palestinian terrorists near the Otniel junction and suffered back and neck injuries along with mental anguish and fear.

**July 8, 2001:** Avital Cohen, 22, was shot in the back in a terrorist attack near Eli. The bullet injured her shoulder, punctured her lung, and caused additional injuries. Hamas or PIJ was responsible for the terror attack.

**June 14, 2001:** Hallel Shmuel Angelman, 53, was seriously injured in a Fatah/Tanzim terrorist shooting attack on the Bethlehem bypass tunnel road. Hallel suffers blast injuries, emotional distress, and is partially disabled.

**June 1, 2001:** A Hamas suicide bomber (Sayid Hassan Hyssein Hotari) blew himself up at the entrance to The Dolphinarium, a disco in Tel Aviv. Most of the teenagers killed or injured were girls between the ages of 14 and 18 celebrating their high school graduation. Two Hamas operatives drove the suicide bomber to the popular club often packed with Russian immigrant teenagers. He slipped unnoticed into line and positioned himself among several girls, including a 14-year-old who had survived a previous bombing in Netanya. Then, while flirting with one of the girls, he triggered the explosives. The blast was so intense that it tore limbs from the victims' bodies, scattered their flesh up to six blocks away, and vaporized the bomber and the girl next to him. Twenty-two people were killed and many more injured. Among those injured were Alexander Vasilev, Arye Levy, Ilan Yitzhakian, Koliev Paik, Asher Sharon, Rita Avramov, and Timor Horsanov.

**May 29, 2001:** Yisrael Deri, 24, was shot and severely injured when Palestinian terrorists fired on his car in a shooing attack at Efrat. Yisrael suffered bullet wounds to his chest and hand.

**May 18, 2001:** A Hamas suicide bomber (Mahmoud Ahmad Mahmoud Marmash) detonated an explosive device strapped to his body at the entrance to the Hasharon Mall in Netanya. 5 Israeli civilians were killed, including David Yarkony, 53, and more than 100 were wounded, including: Parnasoa Cohen, Nira Shalom, and David Chay. Moshe Sa'ada was a member of the rescue teams that responded to the suicide attacks. He has suffered severe emotional harm and has spent several months in a psychiatric hospital. Surviving family members that join as Plaintiffs for this wrongful death are Miriam Ozan and Dalya (Tova) Yarkony, sisters of David Yarkony.

**May 15, 2001:** Idit Mizrahi, 20, of Rimonim, was gunned down in a fatal terrorist ambush as she drove with her father and brother on the Alon Highway to attend a family wedding. The terrorists ambushed the passenger car and fired 30 bullets, 19 of which hit the family's car. Eidit's father, Moshe Mizrachi, suffers severe injuries including injuries to his leg and removal of his toes. Eidit's brother, Amit Mizerachi, 26, suffers injuries, as well, but survived the attack. Surviving family members that join as Plaintiffs are Dalya Mizrachi, mother of Idit Mizrachi, deceased.

**May 13, 2001:** Palestinian terrorists carried out a terrorist shooting attack near Alfey Menashe. Harel Rein, 29, suffers serious physical injuries and emotional distress, including severe shrapnel injuries and permanent damage to his leg as a result of this terror attack.

**May 8, 2001:** Matan Tzur was wounded when Palestinian gunmen open fire on the family vehicle driving between Alfei Menashe and Karnei Shomron.

**May 1, 2001:** Palestinian terrorists opened fire on Asaf Hershkovitz, 30, causing his vehicle to flip and overturn at Ofra and Beit El junction, killing him. The ambush occurred early in the morning between Ofra and Beit El on bypass road number 60 while Asaf was on his way to work for a fencing contractor. Some 25 spent shell casings were found in the vicinity of the shooting.

The attack was carried out by two terrorists who fled into Palestinian-held territory. Assaf was married to Hila, and the father of two children, aged 5 and 3. Assaf Hershkovitz was the eldest son of Arye Hershkovitz, who was killed in a terrorist shooting attack on January 29. Surviving family members that join as Plaintiffs include Hila Hershkovitz, wife, and Rei and Shvut Hershkovitz, children, of Asaf Hershkovitz, deceased.

**April 28, 2001:** Dalit Mordechai was attacked and injured in a rocket attack in the Gaza Strip.

**April 22, 2001:** A Hamas suicide bomber (Imad Kamel Sayid Zubeidi) detonated an explosive device strapped to his body near a bus stop in the city of Kfar Saba, killing one person and wounding 45 people, including Eyal Amran.

**March 28, 2001:** A Hamas suicide bomber (Fadi 'Atallah Yussuf 'Amer) blew himself up near a gas station at the Nave Yamin/Kfar Saba Junction. Two Israeli civilians were killed and 4 were wounded, including Shai Eigner, 19, who suffers shrapnel wounds all over his body, a broken arm, burns, head injuries, and memory loss.

**March 27, 2001:** A Hamas suicide bomber (Dhiya' Hussein Muhammad Tawil) blew himself up near French Hill in Jerusalem injuring 28 people, including Idit Cohen.

**March 20, 2001:** Terrorists attacked and injured Ze'ev Fishfeder, who sustained two bullet wounds in the leg and multiple shattered bones, skin transplants, and severe emotional and psychological injury as a result of the terror attack.

**March 4, 2001:** A Hamas suicide bomber (Ahmad Omar Hamdan 'Alian) detonated an explosives-laden case on the main street of Netanya. 3 people were killed and 65 other individuals were wounded, including Plaintiff Haim Shalom and his wife, Nira Shalom. Avraham Naim was also seriously injured in this terror attack.

**February 22, 2001:** Palestinian terrorists opened fire on civilians located at the French Hill Junction in Jerusalem. Natanel Roni suffered a bullet wound to the back, severe trauma, and emotional distress.

**February 14, 2001:** A Hamas terrorist plowed a bus into a crowd of people at the Azour Junction bus stop, killing 8 people, including Rachel Levy, 19, who was severely injured and died shortly after, and wounding 25 others, including Plaintiff Alex Melamed, 28, and Baruch Vaserman, 30, who suffers severe injury to his legs. Surviving family members that join as Plaintiffs are Henia and Rammi Levy, parents, and Adi and Limor Levy, sisters, of Rachel Levy, deceased.

**January 29, 2001:** Arye Hershkovitz, 55, of Ofra, was killed by shots fired from a passing car near the Rama junction north of Jerusalem. Palestinian gunmen shot him dead near Ramallah in an attack by Force 17. At least three bullets passed through the car's windshield, hitting him in the heart. Hershkovitz, who worked in the Pereg air conditioning company in the Atarot industrial zone, was on his way to Beit El to repair someone's heating system. Hershkovitz was traveling east when terrorists in a red vehicle opened fire at his car and fled toward the nearby Palestinian area. At least 10 cartridge cases were found scattered on the road at the site of the

attack. Hershkovitz's wife, Geula, heard about the shooting on the radio. Her fears were raised when she was unable to reach her husband on his cell phone. She immediately called the regional emergency headquarters, only to find out that her husband was the victim. Surviving family members that join as Plaintiffs include Geula Hershkovitz, wife, and Asaf, Dor, Sagit, and Yasmin Hershovitz, children of Arye Hershkovitz, deceased.

**January 1, 2001:** A Hamas suicide bomber (Hamed Falah Mustafa Abu Hijlah) blew himself up on the main street of Netanya and injured about 35 people, including Plaintiff David Tzafrir, 44, who suffers from hearing loss, emotional distress, and is disabled as a result of the terror attack.

**December 22, 2000:** A HAMAS suicide bomber (Hashem 'Abdallah 'Abd al-Fatah Najar) blew himself up at the Mehola rest stop in the northern Jordan valley. Omer Golan was injured in the attack. Omer suffers from severe burns, damage to hearing, and crushed bones, leaving him severely disabled.

**December 20, 2000:** Rachamim Cohen sustained 11 stab wounds at the hands of Palestinian terrorists in Shoresh. Rachaemim Cohen has suffered permanent physical and psychological damage. Tamzim/ Fatah committed the terror attack and the perpetrator was captured.

**December 12, 2000:** Shlomo Perel, 30, was injured when a shooting attack in Ramallah took place. Perel was shot in the back and arm and suffered permanent physical and emotional harm.

**December 7, 2000:** Palestinian terrorists shot Avishai Gamzoletova, 25, three times, two bullets entered through his back and one through his chest. However, Avishai survived the attack, yet suffers from severe physical injury and pain, medical, therapy, and rehabilitation expenses, as well as serious emotional and psychological injury as a result of the terror attack.

**November 22, 2000:** A powerful car bomb was detonated alongside a passing bus on Hadera's main street, when the area was packed with cars and pedestrians. The car bomb was detonated just before 5:30 P.M. on Rehov HaNassi near the Lev Hadera shopping mall, killing two passengers of the bus. People in the sidewalk stores and residents living above the shops were among the 60 injured. The blast occurred just as the No. 7 Egged bus, en route from Hadera to Givat Olga with more than 20 people on board, had stopped to take on passengers. PIJ was responsible for the terror attack that injured Plaintiff Zahava Azani, 35, who suffers severe emotional distress and is mentally disabled, Avichai Peretz, 20, who loses his left eye, has shrapnel in his jaw and face, and is permanently disabled, Eli Peretz, 37, and Nir Mechav, 34, who suffers shrapnel injuries, damage to the right side of his body, his eyes, and his neck, as well as emotional distress.

**November 20, 2000:** Mordechai Rones, 29, was attacked by Palestinian terrorists as part of a stone throwing attack which resulted in severe injuries to his head and face.

**October 30, 2000:** The murdered body of Amos Machluf was found in a ravine near Beit Jalla. Amos was previously kidnapped by Palestinian terrorists and brutally murdered. Surviving family members that join as Plaintiffs are Helena Veisenberg, mother, Yaron Amsalem, Maya Ben Yishai, and Iris Levy, siblings of Amos Machluf, deceased.

**October 19, 2000:** Fatah/Tanzim members carried out a shooting attack in Shomron area of Israel injuring Yoseph Priel.

10.    Each of the aforementioned victims of terrorism was injured as a result of a terrorist attack that specifically targeted select groups of persons because of their membership in a national, ethnic and/or religious group, with the intent to destroy such group, in whole or in part.

B.    **Defendant Arab Bank**

11.    Defendant Arab Bank is a Jordanian bank headquartered in Amman, Jordan with a federally licensed and regulated branch office in the State of New York. Arab Bank knowingly and willfully provides, distributes, and administers the distribution of financial benefits, money and financial services as rewards and incentives to (a) terrorists who have killed, injured and maimed civilians, or attempted to do so, (b) the families and beneficiaries of such terrorists, and (c) FTOs (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")) as part of a scheme, plan and design to encourage, aid, assist, incentivize and facilitate acts of international terrorism.

**FACTUAL ALLEGATIONS**

**I.    The Campaign of Terror**

12.    For many years, groups of Palestinian militants in the West Bank and the Gaza Strip have acted with a united purpose to eradicate the State of Israel through a campaign of terror, genocide, and crimes against humanity.

13.    In late September, 2000, a new campaign of suicide bombings and other murderous terror attacks began that were authorized, directed, and/or committed by the Islamic

Resistance Movement ("HAMAS"), the Palestinian Islamic Jihad ("PIJ"), the Al-Aqsa Martyrs Brigades ("AAMB"), also known as the Fatah Al-Aqsa Martyrs Brigades, the Popular Front for the Liberation of Palestine ("PFLP"), the Popular Resistance Committees ("PRC"), and Hezbollah — all of whom have been listed by the United States Department of the Treasury as SDGTs and by the United States Department of State as FTOs.

14.     As described in detail below, Defendant Arab Bank Plc knowingly assisted these groups and provided them with material support during their campaign of terror.

A.     HAMAS (The Islamic Resistance Movement)

15.     Several terrorist organizations operate in Palestinian-controlled territory, the largest of which is HAMAS. HAMAS is a radical Islamist terrorist organization committed to the globalization of Islam through violent "jihad" or holy war.

16.     HAMAS is formally committed to the destruction of the State of Israel, is extremely anti-American, and is committed to achieving its objectives by violent means, including acts of terrorism. The HAMAS Charter States that the very purpose of HAMAS is to create an Islamic Palestinian State throughout Israel by eliminating the State of Israel through violent jihad. HAMAS propaganda since the September 11th World Trade Center attacks has praised and glorified Osama bin Laden and his supporters engaged in global jihad. HAMAS, directly and through its network of "charitable" front organizations, has engaged in a campaign of hate and virulent anti-Semitism designed to indoctrinate the Palestinian population, including young kindergarten children, to hate Jews and to incite violence against them. HAMAS uses a network of alleged "charitable committees" to establish and maintain schools, camps, clubs, and mosques to spread and incite hatred and promote violence against Jews and Christians living or visiting Israel.

17.     HAMAS is an acronym for "Harakat Muqawama Islamiyya," the Islamic Resistance Movement, and was founded in December 1987. It is a terrorist organization that has intentionally killed and maimed hundreds of innocent civilians.

18.     The organization is nominally divided into two separate wings, the political wing which supports the so-called "dawa" (its social service or humanitarian component) and the paramilitary wing known as the Izz-el-Din al Qassam Brigade. Although these two components have separate responsibilities, they operate seamlessly, with each component working to conduct the operations and achieve the illegal objectives of the terrorist group as a whole.

19.     HAMAS's social services are, in large part, administered by local "zakat" committees and other "charitable organizations" ("Zakat" means charity in Arabic). These committees and organizations are controlled by HAMAS by, inter alia, HAMAS members, operatives and activists sitting as members of their governing committees; this fact is well known to Defendant Arab Bank.

20.     Due to the substantial expenditures of the HAMAS organization and the fungible nature of money, significant sums of money collected externally under charitable and humanitarian banners are routed for HAMAS's military and other operational uses and used to free up other funds for specific terrorists' acts. HAMAS uses such funds for, among other things, the provision of weapons, explosives, transportation services, safehouses, and salaries for its terrorist operatives and for terrorist recruiters.

21.     HAMAS uses violence, principally suicide bombings, and threats of violence to pressure Israel to cede territory to the Palestinian people, a fact well known to Defendant, which nonetheless knowingly provides financial services to HAMAS, both directly and through its "charitable front organizations."

22.     HAMAS knowingly, willfully, and unlawfully combines, conspires, confederates and agrees to commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, and solicitation to commit murder. International Terrorism has become, in the 21st century and particularly since September 11, 2001, a universally accepted violation of international law and the law of nations. A prohibition against terrorism is an international law norm with clear and definite acceptance among civilized nations. Scores of nations have made terrorism and terror financing severe criminal violations. Terrorism of the type and nature practiced by HAMAS is manifestly in violation of the norms and most basic behavioral rules of international law and civilized conduct, as well as the laws of the United States.

23.     Particularly since September 2000, HAMAS has launched hundreds of attacks targeting civilians that have resulted in the deaths and injury of hundreds of individuals, including over twenty (40) mass murders that have killed more than three hundred (300) civilians, including numerous American, British, and Israeli citizens.

24.     HAMAS has committed attacks that injured or killed many of the Plaintiffs. HAMAS has claimed responsibility for many of the attacks on the Plaintiffs.

25.     On January 25, 1995, HAMAS was designated as a Specially Designated Terrorist Entity ("SDT") and, on October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS as an FTO pursuant to Section 219 of the Immigration and Nationality Act (the "INA") and the AEDPA.

26.     The formal designation has been renewed every two years since 1997.

**B.     Palestinian Islamic Jihad**

27.     Palestinian Islamic Jihad ("PIJ") is an international terrorist organization with

"cells" or units located throughout the world. PIJ is also known as "the Islamic Movement in Palestine," "The Movement," and "The Family."

28.    The PIJ knowingly, willfully, and unlawfully combines, conspires, confederates, and agrees together to commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, and solicitation to commit murder and also provides material support to FTOs in violation of the federal criminal code of the United States and the law of nations.

29.    For example, the organization has committed numerous terrorist attacks, including several that have killed and injured American citizens. Since September 2000, the PIJ has conducted and taken credit for at least 40 murderous attacks, including at least 25 mass murder bombings that have killed over 90 civilians, including U.S. citizens.

30.    On October 8, 1997, the PIJ was designated as an FTO by the U.S. government under the AEDPA. The designation has since been renewed every two years since then.

31.    PIJ published a document describing its organizational structure, goals and principles entitled "Manifesto of the Islamic Jihad in Palestine." The PIJ Manifesto is widely distributed throughout the Palestinian Territories, Jordan, the Middle East, and the entire world.

32.    The Manifesto states: "The Islamic Jihad Movement in Palestine is a revolutionary 'Jihad' movement embracing Islam as Religion and State (Form of Government). It is the vanguard of the Islamic Revolutionary Movement.    The guiding principle or characteristic is that 'Jihad is the solution to liberate Palestine and topple the infidel regimes.'

33.    PIJ, like HAMAS, states as its political constant "the rejection of any peaceful solution for the Palestinian Cause, and the affirmation of the Jihad Solution and the Martyrdom style as the only choices for liberation." PIJ's general goals include the "realization of the Islamic

unity through Collective Jihad [and] the liberation of the Holy Land from the Zionist occupation."

34.     PIJ's Manifesto lists specific means by which it plans to obtain its general goals.

These include:

•     "Triggering a continual attrition of the abilities and capacities of the enemy and striking its economical and financial sources."

•     "The creation of a situation of terror, instability, and panic in the souls (minds) of Zionists and especially the groups of settlers, and force them to leave their houses."

•     "The creation of a psychological barrier between the Jews and the Muslim Palestinian people; and the implementation of a conviction that the coexistence is impossible; and resisting the heralds of the idea of coexistence between Arabs and Israelis."

35.     PIJ publishes slogans, such as the following, to entice people to engage in suicide

bombings and other murderous attacks:

•     Jihad is the way to liberation.

•     Jihad is the way to Unity and Union is the way to consolidation.

•     Martyrdom awards life.

•     The Muslim Populations are the dimension of the Intifada.

•     Blood is the dower for Freedom.

•     Victory or Martyrdom, the way for Jihad.

36.     PIJ has also established committees including: the Cultural Committee to publish

leaflets and booklets and to prepare videotapes and audiotapes to spread the message of the

Movement; the Financial Committee to collect financial contributions, invest those contributions,

and distribute the contributions to "different fields of action"; the Public Relations Committee to

be the spokesmen of the Movement and to spread PIJ's message; and the Committee for

Prisoners and Martyrs to spread money received from abroad to the families of "martyrs" and prisoners.

37.     In January 1995, PIJ was listed as an ("SDT") by the U.S. Department of Treasury pursuant to Executive Order 12947 prohibiting transactions with groups that threaten to disrupt the Middle East peace process.

38.     On October 8, 1997, PIJ was designated an FTO by the U.S. Secretary of State pursuant to 8 U.S.C. §1189, by publication in the Federal Register. It became unlawful to provide material support and resources, including currency or monetary instruments, financial services, personnel, transportation, and other provisions, to any component of PIJ.

39.     The designation of PIJ as an FTO was a public event well-known to the entire banking community, including Defendant Arab Bank.

40.     Arab Bank provided financial services and direct financial contributions to PIJ knowing that PIJ was designated as an SDT in 1995, as a designated FTO in 1997, and as an SDGT in 2001.

41.     PIJ committed attacks against Plaintiffs and claimed responsibility for many of the attacks on the Plaintiffs. Like HAMAS, PIJ uses a network of alleged "charitable organizations" to fund its illegal terror activity.

C.     Al-Aqsa Martyrs' Brigade

42.     The Al-Aqsa Martyrs' Brigade (*Kata'ib Shuhada' al-Aqsa*) ("AAMB" or "Fatah AAMB") functions with the help of senior officers of other elements of the Palestinian Authority's armed entities, the Tanzim and Force 17, who have provided illegal weapons, training and intelligence to help carry out the attacks.

43.     AAMB is a paramilitary offshoot of the governing Fatah movement, which

nominally functions as the one party government of the Palestinian Authority. Force 17 and Tanzim are also paramilitary offshoots of Fatah that have committed acts of terrorism since at least early 2001.

44.     These organizations have committed numerous terrorist attacks, including several that have killed and injured American citizens. Since September 2000, AAMB has conducted and taken credit for dozens of murderous attacks, including a pair of January 2003 suicide bombings in downtown Tel Aviv that killed 23 people and injured approximately 100 others, and a string of other attacks that have killed more than 70 civilians and wounded more than five hundred (500) others, including U.S. citizens.

45.     AAMB's and Force 17's political lineage is secular and not Islamist in orientation, but they have adopted both the religious rhetoric and murderous acts of their radical Islamist counterparts.

46.     The AAMB organized some of the most gruesome terrorist attacks in Israel, especially during the escalation of violence in 2001 and 2002. In that period, the AAMB increased the level of its cooperation with other terrorist organizations, including HAMAS, PIJ, and PFLP. A number of bombings and shootings were perpetrated by the AAMB, individually or in partnership with other terrorist groups.

47.     On April 2, 2002, Israel made public an invoice that was found among documents taken by Israeli troops in Arafat's Ramallah compound during Operation Defensive Shield. The invoice, titled "Financial Report" and dated September 16, 2001, appears to be a bill to the Palestinian Authority from the AAMB. It requests payment from Arafat's government for, among other things, electrical and chemical components for 30 bombs: "We need about 5-9 bombs a week for our cells in various areas." The payment was approved.

48.     AAMB recruited 15-year-old boys to carry out suicide bombing attacks. AAMB promised the people they recruited for suicide bombings that payments would be made to their families after the attacks were conducted.

49.     Zakariyya Muhammad Abd Al-Rahman Zubeidi is the head of the terrorist infrastructure of AAMB in the Jenin area. In recent interviews with Israeli and foreign media, he has repeatedly stated that he regards his orders as holy, and that he will "fight and not stop." Zubeidi also admitted to a BBC correspondent that he had received money from the AAMB (his share of the $50,000 Fatah gives AAMB every month).

50.     The terrorist activities and ideology AAMB espouses are well-known throughout the Palestinian Territories, Jordan, the Middle East, and the world. Its terrorist attacks are widely reported and the group publicly advertises its involvement in terrorist attacks. AAMB publishes information for distribution in the Middle East, including the Palestinian Territories and Jordan, and maintains a website which is available for the world to view.

51.     Furthermore, on March 27, 2002, pursuant to the authority of section 1(b) of Executive Order 13224 of September 23, 2001, the Deputy Secretary of State, acting under the authority delegated to him by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, has designated the AAMB as an SDGT.

52.     On March 27, 2002, pursuant to section 1(a)(ii)(A) of the Executive Order 12947 of January 23, 1995, the Deputy Secretary of State, acting under the authority delegated to him by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General determined that AAMB has committed, or poses a serious risk of committing, acts of violence that have the purpose or effect of disrupting the Middle East peace process,

53.     AAMB committed attacks and claimed responsibility for many of the attacks

114176.v1                                                38

against the Plaintiffs.

54.     Arab Bank provided financial services and direct financial contributions to the AAMB knowing that the group was engaged in terrorist acts. This financial support continued even after AAMB was designated as an SDGT and an FTO.

**D.     Popular Front for the Liberation of Palestine**

55.     The PFLP was founded on December 11, 1967 with the union of two left-wing Palestinian organizations. Its leaders were Wadi' Haddad (who later became responsible for terrorist operations) and George Habash, the general secretary.  The PFLP is a Marxist organization that advocates armed insurrection. It perpetrates show-case, media-oriented attacks, particularly the hijacking of planes, to bring the Palestinian cause to public attention.

56.     In 1971, under the leadership of Habash, the organization took a more pragmatic line.  Nevertheless, the PFLP never agreed to recognize Israel and left the PLO after the acceptance of the "Stage Strategy" (June 1974) as adopted in Cairo by the Palestinian National Council. Although the PFLP continued its pragmatic line, it remains opposed to the Oslo accords and is critical of the Palestinian Authority, despite making its peace with Arafat and returning to the ranks of the PLO.

57.     In May 2000, Habash resigned as general secretary because of failing health and was replaced by Abu Ali Mustafa.  Mustafa directed the organization to perpetrate terrorist attacks against Israel. He was killed in an Israeli operation on August 21, 2001 in Ramallah and was replaced by Ahmad Sadat.  Sadat directed the assassination of Rehavam Ze'evi, the Israeli Minister of Tourism (October 17, 2001).  In the wake of Israeli and international pressure that arose from the assassination, Sadat was arrested by the Palestinian Authority and is today in "custody" in Jericho.

58.     During the current violent confrontation, the PFLP called for an armed insurrection and perpetrated a number of terrorist attacks despite the fact that its operational-terrorist wing is smaller than those of the other Palestinian terrorist organizations.

59.     In 1995, the PFLP was named a SDT pursuant to Executive Order 12947. Two years later, like HAMAS and PIJ, the PFLP was designated as an FTO.

60.     The PFLP has committed terror attacks against many of the Plaintiffs.

61.     Arab Bank provided financial services and direct financial contributions to the PFLP knowing that the group has engaged in and continues to engage in terrorist acts. This financial support continued even after the PFLP was designated as a n SDT and an FTO.

62.     Defendant Arab Bank has knowingly supported the terrorist, genocidal, and human rights atrocities described herein.

E.     **Organizations that Knowingly Provide Money to Terror Organizations**

63.     The terror organizations described above receive money from a number of organizations around the world such as: the International Relief Fund for the Afflicted and Needy" ("IRFAN") in Canada; the Holy Land Foundation ("HLF") in the United States; the Palestinian Relief and Development Fund ("INTERPAL") in the United Kingdom; the *Comnite de Bienfaisance et de Secours aux Palestiniens* ("CBSP") in France; the Al Aqsa Foundation or Fund in Germany; the Palestinian Association in Austria ("PVOE") in Austria; the *Association de Secours Palestinien* ("ASP"), which is a subsidiary of CBSP, in Switzerland; the Sanbal Al Aqsa in Sweden; the Sanibil Association for Relief and Development in Lebanon; and the Saudi Committee in Support of the Intifada Al Quds in Saudi Arabia and the surrounding Persian Gulf region. These organizations knowingly provide money to HAMAS and other Palestinian terror

groups. HAMAS also has organizations in Qatar and Dubai that collect funds for HAMAS in those regions. The heads of these organizations are often well known HAMAS leaders.

64.     These HAMAS finance entities also have substantial interconnections.   For example, Sanibil represents INTERPAL in Lebanon.  Upon the outbreak of the Second Intifada, in October 2000, the "Union of Good" ("UG") (*I'tilaf al-Khayr* in Arabic) was created as part of the conspiracy and scheme to raise funds for terrorist activity.  The UG was established to serve as an umbrella organization for global fundraising for Palestinian jihad.  The UG is headed by Dr. Yussuf al-Qardawi, who has issued a *fatwa* authorizing suicide bombing attacks against Israel.  The UG is run by 'Essam Yussuf, a leading figure in INTERPAL.  The Palestinian Authority ("PA") considers UG to be a body supporting HAMAS.  Arab Bank has provided financial services to UG and has allowed it to direct funds to Arab Bank branches.  UG directed donors "to transfer money to Arab Bank accounts all over the world."  Arab Bank has also transferred funds for UG to the Nablus based *Al-Tadhamu*.  These funds were then distributed to *shaheed* families, including relatives of those who committed suicide bombing attacks in Israel.

65.     In Saudi Arabia, two specific groups were created to raise funds to aid in the proliferation of the terrorist objectives of Hamas, PIJ, AAMB, and/or PFLP.  These groups, called the Popular Committee for Assisting the Palestinian Mujahideen and another group formed in October, 2000 known as the "Saudi Committee for Aid to the Al-Quds Intifada," set up "Account 98 Accounts" at banks all over Saudi Arabia to raise funds specifically for the families of the martyrs of Hamas, PIJ, AAMB, and PFLP.  In addition, the committees solicited private donations directly to accounts at Arab Bank.  Funds deposited into Account 98 Accounts at banks in Saudi Arabia, including Arab Bank's Saudi affiliate, Arab National Bank, were transferred to accounts at the Arab Bank.  The Arab Bank would then transfer these funds to the families of the

114176.v1     41

martyrs through the branch offices of the Arab Bank within the West Bank and the Gaza Strip. Often Account 98 funds went through Arab Bank's branch in New York, NY, USA, before being transferred to accounts in the Middle East.

66.     Arab Bank has illegally provided financial services to most, if not all, of the HAMAS fundraising entities described in the preceding paragraphs. Arab Bank has done this with general awareness of the unlawful nature and purpose of the activities of these organizations. In May 1997, the Government of Israel declared four of these organizations - -- HLF, INTERPAL, Al Aqsa Fund, and CBSP — unlawful because of their association with, support of, and control by HAMAS. Despite this and other means by which Arab Bank knew of the unlawful activities of these organizations, it has nevertheless continued to actively encourage and allow the use of its worldwide banking branches to assist HAMAS with its unlawful purposes. For example, Arab Bank branches in London, Paris, Frankfurt, Geneva, New York, and Rome have been used to transfer funds for these HAMAS entities. In August 2003, the United States designated CBSP, ASP, INTERPAL, PVOE, and SANABIL as SDGTs because they were controlled by HAMAS. The US designated Al Aqsa Foundation as a SDGT in May 2003.

## H.     The Al Aqsa Intifada or Intifada Al Quds

67.     Following the collapse of the peace negotiations at the presidential retreat at Camp David in the summer of 2000, Palestinian terror organizations launched a broad-based terror campaign against the State of Israel. This waive of violence started at the end of September 2000.

68.     This explosion of violence was widely termed the so-called Al Aqsa Intifada or Intifada Al Quds. In the west, it is often called "the Second Intifada."

69.     This new Intifada was both qualitatively and quantitatively different from prior waves of Palestinian terrorism.

70.     During this Intifada, since late September 2000, the Palestinian terrorist organizations have carried out over 25,000 terrorist attacks, of which 147 were suicide bombing attacks that caused the death of approximately 525 people and wounded more than 3,000. The non-suicide bombing attacks have claimed approximately 500 lives.

71.     In a series of Friday sermons which aired on Palestinian TV ("PATV"), Dr. Muhammad Ibrahim Madi clearly stated the "lofty goal" of terrorist suicide bombings when he cried out: "Shame upon he who does not educate his children the education of Jihad [armed struggle against the infidels, or holy war]... blessings upon he who dons a vest of explosives on himself or on his children and goes in to the midst of the Jews and says: Allah Akbar [Allah is Great]..." [Dr. Muhammad Ibrahim Madi, Friday sermon, PA television, June 8, 2001].

72.     A few months later, on August 3, 2001, Dr. Madi recounted a conversation he had with a 14 year old boy who wanted to blow himself up and kill Jews. His blood-curdling sermon broadcast live on PATV that day went:

> I was uplifted when a youth said: "Oh, Sheikh, I am 14 years old, I have 4 more years and then I will blow myself up among Allah's enemies, I will blow myself up among the Jews." I said to him, "Oh young child, may Allah let you merit Shahada [martyrdom] and let me merit Shahada..."
>
> All the weapons must be aimed at the Jews, Allah's enemies, the cursed nation in the Koran, whom Allah describes as monkeys and pigs, worshippers of the calf and idol worshippers... Nothing will deter them except the color of blood in their filthy nation... unless we blow ourselves up, willingly and as our duty, in their midst...
>
> May Allah make the Moslem rule over the Jew. We will blow them up in Hadera, we will blow them up in Tel-Aviv and in Netanya so that Allah will make us masters over this riff-raff. We will fight against them and rule over them until the Jew will hide behind the trees and stones and the tree and stone will say: "Moslem! Servant of Allah, there is a Jew behind me, kill him." We shall enter

Jerusalem as conquerors, and Jaffa as conquerors, and Haifa as conquerors and Ashkelon as conquerors.... Blessings upon he who educates his sons in the path of Jihad and Shahada! [Dr. Muhammad Ibrahim Madi, Friday sermon, PATV, August 3, 2001]

73.     At a Muslim Arab Youth Association Conference in Los Angeles in 1994, Sheikh Muhammed Siyam (who at the time was HAMAS's representative to the Sudan) stated: "I've been told to restrict or restrain what I say . . . I hope no one is recording me or taking any pictures, as none are allowed . . .because I'm going to speak the truth to you, It's simple. Finish off the Israelis. Kill them all! Exterminate them! No peace ever! Do not bother to talk politics."

74.     The preferred method of mass murder used by HAMAS and the other terrorist organizations is the suicide bombing, in which an individual carries an explosive device that he or she detonates in a bus, restaurant, or other crowded public gathering place, even family religious events or celebrations.

75.     The device is typically packed with nails, bolts, and ball bearings, which, when detonated, lodge themselves deep within the bodies of those individuals who happen to be inside the blast radius, causing cruel and horrific injuries. HAMAS has even used or discussed using rat poison or AIDS-infected fluids to enhance the destruction, death, and devastation. Terrorists who lose their lives in jihad are considered "martyrs" (or *"shaheed"* in Arabic) by the terrorist groups and their sympathizers. A suicide bomber is often referred to as *"istishhad"* and the operation, i.e., the suicide bombing act, is referred to as *"amaliyyah istishhadiyyah."* Thus an *istishhadi* is necessarily a *shaheed*, but not every *shaheed* is necessarily an *istishhadi*. These distinctions are not always clearly made.

76.     In fact, because many suicide bombers are stopped and killed before they can successfully detonate their explosive charges and others have died as a result of premature or

accidental detonations, the term "martyr" or *"shaheed"* has often been used by these organizations to include suicide bombers as well as all others killed in the course of attempts to commit acts of violence against Israeli, American, or other Western targets.

77.    During this Intifada, HAMAS has carried out the largest number of suicide bombing attacks of all the Palestinian terrorist organizations, approximately 58 attacks or about 40% of the total. PIJ has carried out 39 such attacks or about 27% of the total. AAMB and Fatah related attacks account for about 23% of the total. PFLP has carried out 8 suicide attacks. Hezbollah has often handled Palestinian terrorist infrastructures in the PA administered territories, especially for AAMB, Fatah, and Tanzim.

78.    The objectives of the Al Aqsa Intifada terror campaign include intimidating and coercing the civilian population of Israel and attempting to influence the policy of the Israeli and US government by compelling Israel to withdraw from territory it presently controls. Syria, Iran, and Lebanon provide support to the Islamic terror organizations.

79.    The eruption of the Al Aqsa Intifada in late September 2000 changed the dynamics of Palestinian terrorism in four material respects:

> A.  The Intifada, from its inception, was marked by a massive escalation of violence, which quickly transformed the tactics of the Islamist terrorist groups from the margins to the mainstream of Palestinian politics.
>
> B.  The unrestrained violence of the Intifada and the increasing credibility and prestige it provided for the Islamist groups forced other (secular) Palestinian terrorist groups to adopt Islamist rhetoric and tactics.
>
> C.  The main rival terrorist groups began cooperating and coordinating their activities, including but not limited to HAMAS, PIJ, PFLP and The Popular Resistance Committees.
>
> D.  Saudi financial support for the terrorist groups coalesced into a more ambitious and more formal structure through the formation of the Saudi Committee in Support of the Intifada Al Quds.

## III.   Arab Bank Plc Knowingly Joined the Scheme to Finance Palestinian Terrorism

80.    In 1984, the Shoman family that owns and controls Arab Bank Plc published a biography of Mr. Abdulhameed Shoman (the bank's founder) entitled *The Indomitable Arab*, in which Mr. Shoman consistently sets forth his antipathy towards Jews, Zionists, and the State of Israel. The book also clearly describes Mr. Shoman's abhorrence for the United States, which he claimed to have once admired, but later loathed because of its support for Israel.

81.    Prior to the establishment of Arab Bank, its founder Abdulhameed Shoman described his great anger toward Zionists, Jews, and others whom he believed stood in the way of the growth of the Arab economy. In his biography he is quoted as saying that within a few years Zionism will have grown strong enough to control the entire economy. "I believe that all business dealings with the Jews - - buying, selling or banking transactions — are damaging to our country's best interests."

82.    In his final speech before four hundred employees of Arab Bank, Mr. Shoman also explained his hatred for Americans that had developed over the years:

> I liked the Americans. I once bore their nationality, and gathered my fortune in their country. But since they started to help the Zionists and supply them with arms to fight us, I have come to detest them. It was not the Jews, but the Americans, who fought us.

83.    Mr. Shoman's son, Abd Majeed Shoman, was a chairman of the Arab Bank and a vocal supporter of the latest Intifada.

84.    He was, for example, the chairman of the Popular Committee in Support of the Palestinian Intifada, which was established during the first Intifada in 1987-1988. The Committee managed to raise approximately eight million Jordanian Dinar (JOD 8,000,000), or approximately $11,000,000, for "martyrs' families," paying 1,000 JOD ($1,400) to each martyr's

family and 300 JOD ($425) to each Palestinian injured in the violence. From 1995 to 2000, the Popular Committee raised an additional 1,200,000 JOD for the families of the martyrs of the first Intifada.

85.     A meeting of the Arab League was held in Cairo, Egypt in October 2000 where it was agreed, with the knowledge and participation of Defendant Arab Bank and Bank Chairman Abd Majeed Shoman, that a financing distribution network or mechanism needed to be put in place to further fund and fuel Palestinian Terrorism to achieve various political and nationalistic goals.

86.     On or about October 16, 2000, the Saudi Committee in Support of the Intifada Al Quds (hereinafter referred to as the "Saudi Committee") was established as a private charity registered with the Kingdom of Saudi Arabia in furtherance of this plan.

87.     On November 22, 2000, Arab businessmen held a meeting with Yassir Arafat at which a new entity, the Fund for Support of the Persistence of the Palestinian People, was formed to further bankroll the Palestinian Authority and the Intifada.

88.     Defendant Arab Bank pledged $2,000,000.00.

89.     Mr. Shoman personally pledged $500,000.00.

90.     The Shoman family's financial support of the terrorist Intifada continued in June of 2001, when the Cultural Center of the Abdul Hamid Shoman Institute launched an exhibition on the subject of "the martyrs of the Palestinian Intifada." The stated purpose of the exhibit was to "honor to the martyrs of the blessed al-Aqsa intifada" by means of conveying the human and spirited image of their lives.  The exhibit featured presentations of the martyrs' personal belongings, such as clothing and "tools" they used, along with a introduction to their lives and deeds until the day of their "martyrdom."

91.     Accordingly, the Bank's financial and ideological support for the terrorist Intifada is a matter of public record, and its participation in diligently implementing the universal terrorist death and dismemberment insurance scheme is done knowingly and deliberately,

92.     According to the Saudi Committee, its purpose was to support the "Intifada Al Quds" and "all suffering families, the families of the martyrs and the injured Palestinians and the disabled."

93.     The Saudi Committee decided to bestow financial support upon the martyrs' families on the same terms as before and to call upon the Jordanian government to make the donations tax-exempt. The committee's chairman, Abd Majeed Shoman, the Chairman of the Arab Bank, opened the meeting saying:

> After the blessed Intifada [erupted] I thought that we should discuss what to do about it. There are some organizations which are fundraising donations including the Welfare Association [headed by Mr. Shoman]. The Welfare Association received donations and it has funds. I received phone calls and donations from benevolent people, and the Arab Bank's board and bank's employees decided to donate 5% from October's salaries [for the Intifada]. In spite of the fact that donations were collected and are available, nothing was transferred to anybody. It is our duty to act and therefore I summoned this meeting to hear from you.

94.     Mr. Shoman objected to locating the Committee's office in the Arab Bank's Amman headquarters building, but he left open the possibility of "loaning" an accountant to the committee.

95.     Ultimately, it was decided that the Committee's office would be located in the Amman Chamber of Industry headquarters where, in fact, it opened on November 1, 2000.

96.     As referenced by Mr. Shoman in his speech, on or about October 7, 2000, the Arab Bank announced that it would bestow financial donations upon Palestinians injured during the Intifada. Its employees donated 5% of their monthly salary (for the month) to the Palestinian cause.

97.     Despite its claim that it is a "humanitarian organization," the Saudi Committee constitutes a professional fundraising apparatus intended to subsidize the Intifada Al Quds. The Saudi Committee subsidized, for example, the Palestinian terror campaign and bankrolled HAMAS and other terrorist organizations and their related charitable front organizations in the West Bank and Gaza. This fact was known to Defendant Arab Bank, who knowingly and willfully joined with the Saudi Committee and the other conspirators to fulfill this goal.

98.     These goals are accomplished in several ways, all of which depend on the knowing participation and substantial assistance of Defendant Arab Bank.

99.     Defendant, the Saudi Committee, HAMAS and other terrorist organizations described herein provide a comprehensive insurance benefit of $5,316.06 for the families of Palestinian terrorists, guaranteeing "universal coverage" to terrorists and their beneficiaries whenever a terrorist is killed. The lump sum initial payment is often followed with lesser monthly payments.

100.     Benefits (less than for when a terrorist is killed) are also provided if the terrorist is either injured by Israeli security forces or captured as a result of his or her criminal conduct.

101.     The Saudi Committee has provided millions of dollars to the families of "martyrs," suicide bombers and individuals killed by Israeli forces during the commission or attempted commission of terrorist acts and to the families of Palestinians wounded during violent confrontations with Israel's security forces, and to those activists held in Israeli custody. This type of support is critical to HAMAS's efforts to win the hearts and minds of the Palestinian people and to create an infrastructure capable of solidifying HAMAS's position within Palestinian society.

102.     Moreover, the insurance benefit not only provides universal coverage for specific

members of preferred terrorist organizations such as HAMAS, but is intended as universal coverage available to terrorists belonging to any terrorist organization or to none at all, thereby incentivizing and rewarding all terrorists in Israel and eliminating the potential distinctions between terrorist groups, individual ("freelance") terrorists, and the more established terrorist cells, and also between the secular and radical Islamist terrorist organizations.

103.    Defendant Arab Bank knowingly and willfully administered this comprehensive terrorist insurance scheme by distributing the benefits in accordance with lists of families of "martyrs" and others eligible for "coverage." According to a sworn declaration of the Chief Banking Officer of Arab Bank, Plc made on November 11, 2004, "beginning in December of 2000, the Saudi Committee made approximately 200,000 payments into Palestine through Arab Bank branches totaling over US\$90,000,000."

104.    Arab Bank actively and knowingly participated in a formalized process which required the families of so-called martyrs to obtain an official certification of their deceased relative's status as a bona fide martyr, replete with an individualized identification number.

105.    Arab Bank, in turn, is provided relatively detailed lists consisting of the names of the martyrs and personal information and details concerning the date and manner of their deaths. Information is provided to Arab Bank by the Saudi Committee and representatives of the leading terrorist groups via their "charitable" front organizations.

106.    Arab Bank, in consultation with the Saudi Committee and local representatives of HAMAS, finalizes the lists, maintains a database of persons eligible under this universal coverage plan, and opens a dollar account for each beneficiary. Every Palestinian family eligible under this universal coverage plan is encouraged to collect the terrorism benefits through a local branch of the Arab Bank in the West Bank or Gaza.

107.    If they choose to collect the insurance benefit, the families are required to present to the bank their "official" certification from the Palestinian Authority establishing the bona fides of the martyr.

108.    If the documentation proves satisfactory, Arab Bank issues a receipt to the designated recipient of the martyrdom insurance benefit. For example, Dia A-Tawil perpetrated a suicide bombing attack on March 27, 2001 on behalf of HAMAS. He was designated Palestinian Authority Martyr No. 449. His father, Hussein Mohamed Favah Tawil, presented the "official" certification to Defendant Arab Bank, and received a confirmatory receipt stating that the benefit was paid to his Arab Bank account in Ramallah.

109.    A report from the web site of the Saudi Committee described the mechanism of the donations and the transfer of the money:

    The Mechanism of delivering relief:

    1.    Assessment study of the Aids-relief inside Palestine
    2.    Choosing the Programs that help in achieving the Aims and goals of the Committee
    3.    Exploring How to deliver Aids-relief to beneficiaries
    4.    Choosing some recommended Palestinian personalities for Follow-up
    5.    Setting a Coordination council in Gaza and the West Bank
    6.    Listing names of beneficiaries of Committee programs and completing and revising the information
    7.    Studying names of beneficiaries and opening files for them for taking the needed procedures later
    8.    Sending Name-lists of beneficiaries to his Highness, the General Supervisor for taking the needed procedures
    9.    **Opening accounts for each beneficiary in the branches of Arab Bank in Palestine**
    10.    Transferring Money for each beneficiary and notifying them

    (http://www.alquds-saudi.org/static/mechanism.htm):

110.    Employees of the Arab Bank in the Palestinian territories knew or were willfully blind to the role of each of these families in terrorist activity against persons located in Israel.

114176 v1                                    51

111.    In addition, the website section dealing with the Arab Bank Palestine branch reflects certain direct financial donations of Arab Bank for "Palestinian community projects." These payments reveal the Arab Bank's clear role in supporting the violence against civilians.

Among the donations listed are:

- 17/8/2004 - Mandella Organization/ Donating School Bags to Prisoners' Children

- Arab Bank offered prisoners' children school bags and stationery, attempting to help and support them and their children with their suffering.

- 2/5/2004 - Arab Bank offered donations to Abu Jihad's Center for Prisoner Movement at Jerusalem University.

- Arab Bank offered donations to Abu Jihad's Center for Prisoner Movement at Jerusalem University. The donations were given through buying books about Palestinian Prisoners' lives, thus supporting the Prisoner's Movement in Palestine.

- 21/3/2003 - Arab Bank sponsors the Event of Recognizing Mothers of Martyrs and Prisoners.

- Arab Bank sponsored the event of recognizing the Mothers of Martyrs and Prisoners in Al Amari refugee camp. The event was organized by the Women's Center in the refugee camp.

(http://www.arabbank.ps/english/inner.asp?item=3&mtitle=4&stitle=1)

112.    The Bank explicitly acknowledges its support of "mothers of Martyrs and Prisoners," showing its direct involvement in assisting families of terrorists.

113.    The conspiracy between Arab Bank, the Saudi Committee, HAMAS, PIJ, AAMB, PFLP, Interpal, IRFAN, and others is ultimately designed to provide substantial material support to Palestinian terrorist organizations, especially the largest Islamic terror organization, HAMAS, and to provide a meaningful incentive both to prospective recruits and to individuals contemplating the commission of independent acts of violence in the name of the "popular resistance." Arab Bank knew that the purpose of the conspiracy and acts taken pursuant thereto

were to encourage others to engage in terrorist activities and to support the continued commission of terrorist activities.

114.    Arab Bank was and is aware of the methods and means by which the terrorist organizations seek to carry out their objectives.  In fact, Arab Bank's own support of and commitment to the violent goals of its co-conspirators are embodied in the personal commitment of Arab Bank's Chairman, Abdul Majeed Shoman, who, according to published reports in *Al Bayan* (a newspaper in the United Arab Emirates), traveled to Qatar to a meeting to raise money to finance and support the Al Aqsa Intifada.

115.    In a published report in July 2000 in the Jordanian daily newspaper, *Addustour*, Abdul Majeed Shoman is described as favoring the destruction of the State of Israel.

116.    A published report in an October 2000 issue of the Jordanian daily newspaper *Addustour* stated that both the management and employees of Arab Bank were donating funds to support the Intifada.

117.    Accordingly, neither the ideology nor the actual conduct of the Arab Bank is passive or indifferent to the goals of and means employed by its terrorist co-conspirators; rather, the Arab Bank is a knowing, willful, and material participant in the terrorists' conduct.

118.    By diligently implementing the "universal insurance" scheme, defendant Arab Bank knowingly, willingly, and substantially assists in the recruitment of terrorists.

119.    Any person who chooses to participate in a suicide bombing or other terrorist attack does so secure in the knowledge that, if he or she is killed in that attack, the financial needs of his or her family will be more than met for some time.

120.    Similarly, such persons are virtually assured of receiving a substantial stipend if they are injured or detained.  One 15 year old boy captured by Israeli soldiers before he was able

to blow himself up in a suicide mission at an Israeli checkpoint was asked by a BBC Reporter whether he was promised anything in return for carrying out the attack. The little boy responded: "Of course they did. They told me, once you carry out the operation and the soldiers come and demolish your home, we'll stand by your parents and rebuild your house and give them money."

121.    In hearings in 1990 regarding the then-pending Antiterrorism Act of 1990, Joseph A. Morris, a former Department of Justice attorney and former General Counsel of the United States Information Agency, testified:

> International terrorism has become, in many respects, an industry. It rests on a foundation of money. Money is often more important to the masters of terrorism than are people. That they care little for their victims goes without saying; but it is instructive of many terrorist organizations appear to care little for their own operatives, treating them as fungible and dependable.

122.    For each terror harming the Plaintiffs in this Complaint, all of the terrorists and their families were eligible to receive money from the Arab Bank because of the terrorist acts.

123.    In short, the Saudi Committee raised funds from private donors in Saudi Arabia and elsewhere in the Persian Gulf region and then allocated payments to Defendant Arab Bank to fulfill its public pledge of universal insurance coverage to Palestinian terrorists. Interpal, HLF, and IRFAN performed the same activities in their respective regions.

124.    HAMAS, through its "charitable fronts", collects data on its own operatives as well as all other terrorists killed, injured, or placed in Israeli custody and transmits the information to the Saudi Committee and Defendant Arab Bank.

125.    Through the program administered by Arab Bank, the Saudi Committee paid death benefits to approximately 200 fallen "martyrs" in the first year of its existence alone. As of November 2001, the Saudi Committee paid more than forty-two million dollars ($42,000,000) to terrorists and/or their beneficiaries.

126.    Arab Bank served as the near exclusive administrator for the Saudi Committee's universal insurance coverage plan for Palestinian terrorists and their families.

127.    Indeed, in its original website, the Saudi Committee openly declared that its funds were distributed to the families of martyrs through local branches of the Arab Bank in Palestine. Although it has since been removed from the Internet, the original archived webpage, located at www.alquds-saudia.org\indexa.htm, provided a list under the caption: "What has been done with your donations?"

128.    Item number 10 on the web page responds with the answer: "Opening a bank account for every entitled [Palestinian] through the Arab Bank in Palestine." The website further listed numerous "martyrs" whose cause of death was listed as "suicide attack."

129.    Similarly, in the annual report issued by the Saudi Committee and published in the Saudi newspaper *Al-Jazira* on February 11, 2001, the Saudi Committee identified payments made to Palestinian prisoners as well as Palestinian "martyrs." Notably, Table 4, Column 10 of the report helpfully identifies the cause of death for each martyr.

130.    For example, Musa Abd al-Qadir Ghanimat, the HAMAS operative who perpetrated a suicide attack at the Apropo restaurant in Tel Aviv, is listed as an illustrative martyr.

131.    Accordingly, there can be no confusion as to whether the insurance plan includes the families of suicide bombers and there is no question that Defendant Arab Bank possessed knowledge of this fact.

132.    Defendant Arab Bank provided a convenient means for distributing this universal coverage death and dismemberment benefit across Palestinian controlled territories that would have been far more difficult if attempted by other means, such as courier. Israeli territory

separates Gaza from the West Bank and Israeli military checkpoints often separate one Palestinian city from another.

133.   Arab Bank makes it possible for the terrorist groups to transcend physical obstacles and to provide an organized and professional distribution system that literally underwrites the terror campaign. Arab Bank knowingly allows the terrorist groups to use the speed and efficiencies of the international banking system, including the SWIFTS system of wire transfers, to further their terrorism agenda. Arab Bank has branches throughout the Palestinian administered territories in the area of Israel known as the West Bank and Gaza as well as branches in Lebanon and, more recently, in Syria.

134.   Arab Bank knows the criminal purpose that the accounts it opens and maintains for the Saudi Committee are intended to serve. Arab Bank has knowingly and intentionally joined with HAMAS, the Saudi Committee, Interpal, and IRFAN in the above described financial distribution network with the goal, desire, and objective of furthering the objectives of HAMAS and the other terrorist organizations to achieve their political goals through violent attacks against civilians in Israel, including Plaintiffs.

135.   Arab Bank knew that Account 98 funds were raised, deposited, transferred, and disbursed through a system that proximately resulted in the creation of a self-sustaining terrorist financing system.

136.   For example, following a supermarket bombing by an 18-year-old Palestinian girl, a Saudi telethon reportedly raised more than $100 million for the Palestinians. Similarly, Colonel Munir al Maqda, also known as Abu Hassan, used the Arab Bank to funnel Iranian funds to AAMB. Starting in 2001, over $40,000 was transferred to an Arab Bank account for use in purchasing weapons, expenses, and bomb-making materials. Further, a December 30, 2000,

handwritten letter by Abu Mazen, the PA Representative to the Kingdom of Saudi Arabia, to Saudi Prince Salman complained that Saudi donations in the Gaza Strip were going to an organization called al-Jamiya al-Islamiya (the Islamic Society), which Abbas explained "belongs to HAMAS." Indeed, in the past, HAMAS openly revealed its use of the Arab Bank by soliciting donations and posting account numbers on its Internet site.

137.    Arab Bank also knew that the widespread and systematic campaign of suicide bombings resulted in an increased pattern of suicide bombings. It is a matter of public record that there have been at least 40,000 Account 98 transactions since October of 2000. From September 2000 through December, 2005, there were about 147 suicide attacks, and another 440 or more suicide attacks thwarted. Widely reported statistics available to Arab Bank further establish the widespread impact of suicide bombings on Plaintiffs and other Israeli civilians: between 2000 and 2002 alone, suicide attacks represented only 1% of the total number of terrorist attacks in Israel, but caused approximately 44% of the Israeli casualties. And since September 2000, Palestinian terrorists have attempted over 25,000 attacks, resulting in more than 6,000 casualties, including over 1,000 civilian deaths.

138.    Arab Bank's public statements that it "never participated in any activity knowingly that could lead to violence" is belied by the fact that the Executive Manager of the Saudi Committee stated to Arab News that "we support the families of Palestinian martyrs, without differentiating between whether the Palestinian was a bomber or was killed by Israeli troops." Further, the Saudi Committee's website has long contained records reflecting that money being funneled through Arab Bank as described above went to over 60 families whose main breadwinner(s) were known Palestinian militants who carried out indiscriminate terrorist attacks, including suicide bombers and gunmen who were killed during actual and attempted attacks:

•Said Hassan Hussein Hotari — identified as the suicide bomber who perpetrated the June 1, 2001, attack at the Dolphinarium nightclub in Tel Aviv. HAMAS claimed responsibility. The attack resulted in the killing of 22 people

• Izzedin Shahil Ahmed Masri — identified as the suicide bomber who perpetrated the August 9, 2001 attack on the Sbarro pizza restaurant in Jerusalem. HAMAS claimed responsibility. This attack resulted in the death of 15 Israelis.

• Maher Muhiaddin Kamel Habeishi — identified as the suicide bomber who perpetrated the December 2, 2001 attack on a Haifa bus. HAMAS claimed responsibility. This attack resulted in 15 deaths.

• Wa'fa Ali Khalil Idris --- female, identified as the suicide bomber who perpetrated the January 27, 2002 street attack in Jerusalem. The AAMB claimed responsibility. One-hundred fifty individuals were injured as a result of this attack.

• Mohammed Ahmed Abdel-Rahman Daraghmeh - identified as the suicide bomber who perpetrated the March 2, 2002 attack on an Orthodox Jewish neighborhood in Jerusalem. The AAMB claimed responsibility. Several persons were killed in this attack.

139. Most of the Saudi Committee records assigned to individuals whose names match or closely resemble those of the suicide attackers deem "assassination" the cause of death—however, upon information and belief other records credit "martyrdom." Other records indicate that the individuals they refer to were killed during a "martyrdom operation" or *"amaliyya istishhadiyyah."*

140. In April 2002, as part of Operation Defensive Shield, Israeli Defense Forces

raided the offices of the Tulkarem Charitable Society. The Tulkarem Charitable Society is one of the HAMAS civilian infrastructure's most prominent West Bank institutions and also supports the movement's operational-terrorist activities; it was, therefore, outlawed by Israel in 2002. It was also targeted by the Palestinian Authority as early as December 2001, when the PA froze the funds transferred from the Al-Hussein branch of the Arab Bank in Jordan to the Tulkarem Charitable Society's account.

141.    For several years, the Tulkarem Charitable Society has been headed by HAMAS activist Hosni Hassan Hussein al-Khawajah. Born in 1928 near Tulkarem, he was a teacher, school principal, and merchant. His signature was found on documents captured at the Society's offices in Tulkarem in February 2004. The three authorized signatures are those of individuals also identified with HAMAS.

142.    The Tulkarem Charitable Society purports to conduct a wide range of social, religious, and economic activities. In actuality, the Tulkarem Charitable Society is supported by organizations abroad that provide aid for the infrastructure of HAMAS, PIJ, AAMB, and PFLP in the PA-administered territories, including the following well-known HAMAS front organizations: the HLF in the United States; World Assembly of Muslim Youth ("WAMY") in Saudi Arabia, the Palestinian Relief and Development Fund in Britain ("INTERPAL"), Committee for Palestinian Charity and Aid ("CPSP") in France, and the International Relief Fund for the Afflicted and Needy in Canada ("IRFAN").

143.    The Tulkarem Charitable Society received funds from these organizations and from other institutions all over the world, including many Arab countries, in support of the terrorist infrastructure. Arab Bank facilitated many of these transfers through its branches around the world, including its New York branch.

144.   Among the documents recovered in the raid, Israeli officials discovered a spreadsheet detailing how $545,000 received from the Saudi Committee was allocated to families of Palestinian suicide bombers and other terrorist operatives.

145.   The spreadsheet identifies, among other things, suicide bombers by name, the date of the bombing for which the suicide bomber was responsible and the number of people killed in the bombing, along with other HAMAS operatives directly involved in planning or executing terrorist attacks.

146.   The spreadsheet and other captured documents corroborate information from the Saudi Committee's own detailed, voluminous records.  For example, the following suicide bombers, whose families received payments from the Saudi Committee, are identified on the spreadsheet and in records contained on the Committee's archived website:

> (1) Ahmad Amr Hamdan Alyan, who committed a "suicide act on Netanya" on March 4, 2001;
>
> (2) Mahmud Ahmad Mahmid Marmash, who committed a "suicide act" at the Hasharon Mall in Netanya on May 18, 2001;
>
> (3) Abdel Rahman Hamad, a HAMAS operative, and Salled Al Hotari, the suicide bomber, who were responsible for the June 2001 bombing of the Dolphinarium disco in Tel Aviv;
>
> (4) Fadi Atallah Yousef Amr, who committed a suicide attack at the Neveh Yamin/Kfar Sabba Junction on March 28, 2001;
>
> (5) Izzaddin Shahil Ahmad Al Marsu, the suicide bomber responsible for the attack at the Sbarro restaurant in Jerusalem on August 9, 2001;
>
> (6) Osama Mohammed Abed Baher, the suicide bomber responsible for an attack

on Ben Yehuda Street in Jerusalem on December 1, 2001;

(7) Maher Kamel Muhui el-Din Hubeishi, the suicide bomber responsible for the bombing of a No. 16 Egged bus in Haifa on December 2, 2001;

(8) A'sim Hasan Rehen, who committed a suicide attack on a No. 189 Dan      bus near the entrance to the settlement of Emmanuel on December 12, 2001;

(9) Mohammed Ahmad Daraghmah, the suicide bomber responsible for the attack near a yeshiva in the Beit Yisrael neighborhood of Jerusalem on March 2, 2002.

147.    Another document mentions a PIJ suicide bomber named Murad 'Abd al-Fatah al-Asl, who, on September 9, 2001, perpetrated the suicide bombing attack at the Beit Lid intersection near Netanya. Through Arab Bank, his family was compensated for his death, the razing of their house and the incarceration of his cousin. The total sum was 20,105 Jordanian Dinars [approximately $29,000] and was paid to them through the Bank's Tulkarem branch.

148.    Another document shows the transfer of money to the family of PIJ operative Rami Muhammad Jamil Mutlaq Ghanem, who perpetrated the suicide bombing attack at the London Café in Netanya (in the central part of Israel) on March 30, 2003; 34 civilians were injured in the attack. His family received the exceptional sum of around $5,000 - $7,000 for his action and approximately $14,000 to compensate for the razing of the family's house, in addition to their increased monthly allowance.

149.    An Israeli Defense Forces military report noted that, "according to the captured documents, the [Saudi] Committee was aware that the funds it transferred were paid to families of terrorists who perpetrated murderous attacks in Israeli cities, in which many Israelis were killed and wounded."

150.    In each case, the beneficiaries received the funds through the Tulkarem branch of

the Arab Bank. According to other documents confiscated from the offices, the bank manages all of the society's financial business, including the receipt of funds from external sources and the payment of funds to the families of *shaheeds* and wounded, wanted and imprisoned Palestinian terrorists.

151.    As a result, funds collected, received, and disbursed by Arab Bank directly supported, encouraged, incited, and enabled the carrying out of suicide bombings and other murderous attacks by providing payments aggregating in the millions of dollars to the families and dependants of suicide bombers, prisoners, and other terrorist operatives.

152.    The Saudi Committee and local HAMAS "charitable" front organizations have publicly and repeatedly advertised that purpose in both Saudi and Palestinian newspapers, on television, and on the Saudi Committee's website, all of which are known to Arab Bank and all of which are calculated to -- and do -- reach terrorists and potential terrorists. For instance:

- In the February 10, 2001 edition of the Saudi newspaper *Al-Jazirah*, the Saudi Committee published an annual report in which it listed the names of Palestinian prisoners to whom it provided terrorism benefits as well as the names of the Palestinian martyrs (including the names of those killed in suicide bombings) whose families received terrorism death benefits;

- In a November 23, 2001 edition of the Palestinian newspaper, *Al Quds*, the Saudi Committee placed an announcement listing the names of more than 1,000 individuals who had been injured during the Intifada or held in Israeli custody and invited them or their families "to go to the branches of the Arab Bank in their places of residence to receive their allocations donated by the Committee..."; and

- In a February 18, 2002 advertisement in the Palestinian newspaper *Al Hayyat Al Jedida*, a HAMAS charitable front organization in Ramallah announced that the Saudi Committee "requests that the families of the martyrs whose names are listed herein go to a branch of the Arab Bank in their place of residence to receive the tenth payment offered by the Saudi Committee in the amount of $5,316.06 ...."

153.    Based on the foregoing, Arab Bank knew that that funds that it distributed to finance the activities of the Saudi Committee and others would ultimately be disbursed to support

the infrastructure for, and activities of, Palestinian terrorist organizations, including the designated FTOs of HAMAS, PIJ, AAMB, PFLP, and their other front organizations.

154.    Arab Bank also served another important role. Since the Saudi Committee raises its funds in Saudi currency, which cannot conveniently be converted into Israeli currency (most commonly used in Palestinian controlled areas), those funds are primarily converted into U.S. dollars through the New York branch of Arab Bank and then routed to the local branches of Arab Bank in the West Bank. Arab Bank is also aware that Interpal and IRFAN, like the Saudi Committee, raise funds for HAMAS, PIJ, and others. Despite this knowledge, Arab Bank provides financial services and substantial assistance to Interpal, HLF, and IRFAN with the intent to aid, assist, support, and abet HAMAS. Arab Bank's role is material and essential to the furtherance of the criminal conspiracy in two important respects.

155.    First, Arab Bank provides both the professionalism and the transparency to the process that reassures wealthy donors in Saudi Arabia and elsewhere that the money they are contributing will not be siphoned off by corrupt officials, but will in fact reach the families of terrorists as intended.

156.    Secondly, Arab Bank, through its extensive network of local branches in the West Bank and Gaza, provides an ideal distribution system that offers both convenience to the families of the terrorists, who are able to bypass both the corruption of the Palestinian Authority, and the uncertainty of cash payments delivered by courier, as well as the certainty of an accounting system that minimizes the risk of duplicate payments and unreliable record-keeping.

157.    By knowingly and actively participating in this process, Arab Bank and its co-conspirators — the Saudi Committee, Interpal, HLF, IRFAN, and others — have knowingly aided and abetted each and every terrorist attack committed by Palestinian terrorists since the

formation of the Saudi Committee's universal insurance coverage scheme in October 2000, including those that have injured, harmed, or killed Plaintiffs. That conduct violated American antiterrorism laws and the laws of nations. Defendant has knowingly participated in that unlawful conduct for the purpose of supporting and providing financial assistance to: terrorists, including, but not limited to HAMAS, PIJ, AAMB, PFLP, and other designated FTOs; agents of terrorist organizations and other terrorist-controlled organizations; families of suicide bombers; and the families of other terrorists.

## IV.   Defendant Arab Bank Provides
## Material Support To Foreign Terrorist Organizations

158.   HAMAS and PIJ raise funds to support their terrorist acts through "charitable" front organizations that they control. They also raise funds to finance an educational and social services network through which they can indoctrinate the population with a hatred for Israel, Jews, Americans, and other non-radical Islamists, while also glorifying acts of violence by "*shaheeds*" so that the terrorists will have a Palestinian population ready and willing to engage in terrorism. Especially during the last five years, HAMAS has built a socioeconomic infrastructure in Gaza and the West Bank, with the material support of the Arab Bank, upon which HAMAS supports its operational attack apparatus.

159.   Arab Bank knowingly provides banking services to these "charitable" committees and affirmatively assists them in distributing funds to support the Intifada terror and hate campaign. Throughout the Al-Aqsa Intifada, the Arab Bank has knowingly permitted various terrorist organizations and persons engaged in terrorism to solicit funds for their armed struggle over the radio, TV, and the Internet and has helped that endeavor by providing bank accounts and financial services to further the collection and distribution of funds for that purpose.

160. Arab Bank knowingly provides banking services to HAMAS directly through its Al-Mazra Branch Account # 03-810-622473-0330 in Beirut, which collects funds directly in the name of HAMAS, and through charitable front organizations controlled by HAMAS, which Arab Bank affirmatively assists in distributing funds to support the terror campaign.

161. The United States Department of Justice has identified the website www.palestine-info.com[2] as the "official" website of HAMAS. The website itself solicits funds and asks contributors to send money to its Al-Mazra Branch Account # 03-810-622473-0330 at the Arab Bank in Beirut, but it also asks donors "to cite only the account number and not the name of the [Palestine Information] Center or any other names."

162. This request is necessary because Account # 3-810-622473-0330 is one of the few accounts that Arab Bank operates on behalf of HAMAS and that HAMAS controls and maintains directly.

163. Additionally, Plaintiffs allege that the following entities are fronts, agents or instrumentalities or alter egos of HAMAS:

        a.    Islamic Charity Association aka The Islamic Charitable Society in Hebron;

        b.    Charity Committee in Ramallah aka Ramallah Zakat Committee;

        c.    Jenin Zakat Committee aka The Charity Association in Jenin;

        d.    Nablus Zakat Committee aka Nablus Charitable Committee;

        e.    Tulkarem Charitable Society aka Tulkarem Zakat Committee;

        f.    Orphan Care Association (Bethlehem);

        g.    Qalqilia, aka Qalqiliyah Zakat committee;

        h.    Hebron Zakat Committee aka Hebron Tithing And Alms Committee;

---

[2] The website can also be found at www.palestine.info.info.

i. Halhul Zakat Committee;

j. Al Aslah Association in el Birch;

k. Al-Islah Charitable Society Association in Ramallah;

l. Bethlehem Elehssan Society;

m. Young Muslim's Association in Hebron aka Jam'iyyat al-Shubban al-Muslimin;

n. Al-Ansar Charity;

o. Ramallah and al-Birah Charitable Committee or Society;

p. Islamic Association (Gaza) a/k/a Al Jamaya Al-Islamiya;

q. Al Mujama Al-Islami;

r. Islamic Charitable Society of Hebron a/k/a Al Jamlyah Al-Khiriah Al-Islamiyah;

s. al-Bireh Al Islah Society; and

t. Bethlehem Orphan Care Society a/k/a Jami'yya Ri'aya al-yetim.

164. Arab Bank provides direct financial services to Al-Ansar Charity, Ramallah Charitable Committee, Tulkarem Charitable Committee, the Islamic Association (Gaza) a/k/a Al Jamaya Al-Islamiya, Nablus Charitable Committee and Jenin Charitable Committee. Arab Bank has also been involved in wiring money from the World Assembly of Muslim Youth ("WAMY") to HAMAS fronts when it knew that Israel had outlawed WAMY as a result of its terror financing.

165. The Tulkarem Charitable Committee, Nablus Charitable Committee, Ramallah Charitable Committee, Jenin Charitable Committee, and Islamic Charity Society of Hebron have all been identified by the United States Department of Justice as HAMAS front organizations and the management of each of these "charities" is in fact controlled by HAMAS operatives.

166.   The Tulkarem, Ramallah, and Jenin Charitable Committees and the Islamic Charity Society of Hebron were all designated as "Unlawful Organizations" by the government of Israel in February 2002 because of their connection to HAMAS, a fact which was known or was willfully overlooked by Defendant Arab Bank.

167.   Plaintiffs will show that these entities are the alter ego of HAMAS and knowingly act as agents for HAMAS, all of which is well known to Defendant Arab Bank because, among other things:

a.   leaders and managers of the committees are HAMAS members;

b.   the committees are connected to HAMAS military operations;

c.   The PA has identified the entities as HAMAS entities;

d.   The Palestinian population considers the Committees "to be HAMAS."

168.   Arab Bank provides financial services to agents of HAMAS through the following accounts in the West Bank and Gaza Strip.

(1)   Tulkarem Charity Committee a/k/a Lajna Zakat Tulkarem (Account No. 9070-500010-6-510.

(2)   Tulkarem Charity Committee Account No. 510/0/500010/970.

(3)   Tulkarem Charity Committee (Jordanian Dinar) Account No. 500/0/106500.

(4)   Tulkarem Charity Committee (Euro Account) Account No. 500010-6/596.

(5)   Charity Committee of Ramallah a/k/a Ramallah Zakat Committee. Account No. 510/0/610686

(6)   Charity Committee of Ramallah Account No. 510/0/610686-9030

(7)   Charity Committee of Ramallah Account No. 510/2/610686

(8)   Nablus Zakat Committee Account No. 500/0/400336-0193

(9)   Islamic Charitable Society A1-Bireh Account No. 510/7/602835

(10)   Al-Mujama al-Islami Account No. 6-5/500

(11)   Al-Mujama al-Islami
       Account No. 6-0/5 10
(12)   Islamic Charity Society of Hebron
       Account No. 510/0/9040-750049
(13)   Islamic Charity Society of Hebron
       Account No. 510/2/9030- 610686

169.   In addition, Arab Bank maintained accounts for organizations affiliated with

terrorist organizations including, but not limited to:

| Branch | Account No. | Name on Account | Associated Terrorist Organization |
|---|---|---|---|
| Jenin | 581345 | Jenin Charitable Society | HAMAS |
| Nablus | 400271 | Nablus Al-Tadamun Charitable Society | HAMAS |
| Nablus | 400336 | Nablus Islamic Aid Committee | HAMAS |
| Qalqiliya | 542042 | Al-Qur'an wa al-Sunnah Society Qalgiliya | HAMAS |
| Tulkarem | 500010 | Tulkarem Charitable Society | HAMAS |
| Tulkarem | 503375 | Tulkarem Charitable Society | HAMAS |
| Nablus | 445444 | Al-Lod Charitable Society | HAMAS |
| Nablus | 400415 | Social Center, Rehabilitation Committee, Al-Wafaa' Building Charitable Society | HAMAS |
| Qalgiliya | 540939 | Qalgiliya Charitable Society | HAMAS |
| Nablus | 400739 | Tubas Charitable Society | HAMAS |
| Ramallah | 666473 | Jama'ah al-Islamiya | HAMAS |
| Al-Manara-Qalgiliya | 610686 | Ramallah Charitable Society | HAMAS |
| Al-Bireh | 649611 | A1-Bireh Al-Islah Society | HAMAS |
| Bethlehem | 717520 | Bethlehem Elehssan Society | HAMAS |
| Bethlehem | 709966 | Bethlehem Society for Orphans | Palestinian Islamic Jihad |
| Hebron | 760376 | Hebron Young Muslims' Society | HAMAS |
| Hebron | 750049 | Hebron Young Muslims' Society | HAMAS |
| Hebron | 751100 | Hebron Young Muslims' Society | HAMAS |
| Bethlehem | 713392 | Zakat Committee Dehaishe Refugee Camp | HAMAS |
| Hebron | 751542 | Hebron Elehssan Society | HAMAS |
| Bethlehem | 711161 | Al-Islah Charitable Society | HAMAS |
| Al-Bireh | 609509 | Al-Huda Society — Ramallah | HAMAS |
| Gaza | 124109 | Central Islamic Society — Gaza Strip | HAMAS |

| Ramal | 100208 | Charitable and Children's Mercy Society — Gaza Sirip | HAMAS |
|-------|--------|------------------------------------------------------|-------|
| Gaza | 10188 | House of the Qur'an and Sunnah Society | HAMAS |
| Ramal | 100605 | Trusteeship for the Care of the Aged Society | HAMAS |
| Ramal | 100541 | Al-Ansar Society | Identified with Iran |
| Ramal | 120655 | Al-Ansar Society | Identified with Iran |
| Gaza | 3683 | The Islamic Society | HAMAS |
| Gaza | 365459 | The Al-Nur Prisoner Society | HAMAS |
| Khan Yunis | 2001438 | Khan Ynnis Charity and Mercy Society | HAMAS |
| Gaza | 5858 | Nusseirat Islamic Society | HAMAS |
| Gaza | 150/3 | Khan Yunis Charitable Society | HAMAS |
| Gaza | 35287 | Gaza Charitable Society for the Sick | HAMAS |
| Gaza | 3155 | The Islamic University — Gaza | HAMAS |
| Khan Yunis | 200139 | Qararab Islamic Society | HAMAS |
| Gaza | 15115 | Jabalia Islamic Society | HAMAS |
| Rafah | 2036 | Rafah Islamic Society | HAMAS |
| Azariya | 302656 | Azariya Society for the Fostering of Women | HAMAS |
| Gaza | 39435 | Nur Al-Ma'rifah Society | HAMAS |
| Jenin | 578669 | Jenin Elehssan Society | Palestinian Ishmaic Jihad |

170.   The Arab Bank continued through 2005 to knowingly render financial services for many, if not all, of these HAMAS fronts, terrorist operatives and their families, including Yassin Al Qadi, Waleed Abu Shaikah, Adel Al Harithy, Omar Saleh Saeed Al Amoudi, Muhammad Nazih Sala Abu 'Abah, Muntasser Abu Ghalyon, Na'if Abu Sharakh, Ibrahim Mustafa Ibrahim Abu Shaduf, and Tahaani Muhammad Mahmoud Manameh.   The US Government has alleged that the Treasurer of PIJ, Mohammed Tasir Hassan Al-Khatibe, held a bank account at Arab Bank in Lebanon.   Arab Bank has also knowingly served as a conduit for transferring money from Iran and Syria and its agents and instrumentalities to persons and organizations in Gaza and the West Bank who use such funds to engage in terrorism and incite violence.

171.    The HAMAS charitable front, Al-Ansar Charity, maintains a website proclaiming

that:

> Al-Ansar Society opens its doors to the families of the martyrs who intend
> to register their dead who, with their splendid blood, saturated pure
> Palestine and drew the lines of liberty and the coming dawn. The Al-
> Ansar Society is following in their footsteps and shares in the sorrow and
> the hopes of the families of the martyrs and their relatives.

172.    The website further boasts that it has given money to Palestinians who were

wounded, incarcerated, or killed during the Intifada, including $6,000.00 to the family of Iz Aldin

(also spelled: "Azzadin") Al Masri, the suicide bomber who massacred 15 people, including 7

children, and injured more than 100 people at the Sbarro pizzeria in downtown Jerusalem on

August 9, 2001.

173.    The website of Al-Ansar shows the vital role of the Arab Bank:

> The Director General of the Al-Ansar Charitable Society and the
> person in charge of the portfolio for the care of the martyrs at the
> Society's website said that the Society has furnished the
> management of the Arab Bank with lists of names of the martyrs
> and the families of the entitled beneficiaries, in order to pay the
> monies to which the martyrs are entitled.

174.    Al-Ansar maintains an account with the Arab Bank in Gaza.

175.    The PIJ has also established numerous front organizations, including:

      a.    Al-Ihsan (sometimes spelled Eleshan) Charitable Society;

      b.    Dar-al Huda Society; and

      c.    Islamic Al-Naqqa Society for Women, Bethlehem.

176.    Arab Bank provides direct financial services to these entities and maintains

accounts on their behalf.

177.    Arab Bank has also provided financial services to the AAMB. For example,

Munir al-Maqdah, also known as Abu Hasan, transferred between $40,000 and $50,000 for

weapons, expenses, and bomb-making materials to the Arab Bank account of Nasser Aweis, a senior Fatah operative, and instructed him to report back by telephone on the success of his attacks, such as the January 17, 2002, assault on the Hadera banquet hall. Arab Bank is aware that it provides financial services to the AAMB and other PLO terrorist cells.

178.   Advertisements publicized throughout the Middle East call for donations to Arab Bank accounts to help support the Intifada.

179.   On October 3, 2000, during the early days of the ongoing violent Palestinian-Israeli confrontation, the 'Ala al-Hawaa' ["On the air"] program that appeared on Orbit TV (an Arabic cable TV network backed by the powerful Mawarid Group of Saudi Arabia) interviewed Hezbollah leader Sheikh Hassan Nasrallah and Sheikh Ahmad Yassin, the former HAMAS leader who was killed in an Israeli attack on March 22, 2004. The program showed a slide of the names of banks and account numbers where donations could be deposited for the Palestinians participating in the violent confrontation with Israel: Arab Bank, Geneva Branch, account number 2225200; and Arab Bank, Al-Shamissani, Amman, account number 9171.1.510

180.   The Voice of Al-Aqsa Internet site (www.aqsavoice.net) (which served HAMAS) posted an announcement on May 3, 2004, condemning the Israeli air force's attack on the station. The announcement read as follows: "In order to help renew our broadcasts, you can donate to the Al-Ribat Lil-I'lam account, number 100835 at the Al-Rimal [Gaza] branch of the Arab Bank or [account] number 20669 at the Arab Islamic Bank in Gaza."

181.   Sheikh Yusuf Al-Qaradawi, a leading Islamic cleric in the Middle East whose *fatwas*, or religious edicts, have been adopted by HAMAS, has issued *fatwas* sanctioning the use of suicide bombings, both by men and women, against the people of Israel as a permissible

activity in Islam. Qaradawi has stated, "These operations [suicide bombings] are among the most respectable forms of Jihad. This legitimate terror is allowed by the Qur'an."

182. In addition to issuing *fatwas* sanctioning the use of suicide bombings in a campaign of terrorism against the people of Israel, Qaradawi helped found and currently heads an organization known as the Coalition of Benevolence [in Arabic, "I'talaf Al-Khair"]. This coalition includes Interpal, the Comité de Bienfaisance et de Secours aux Palestinien ("CBSP") in France, the Al-Aqsa Foundation in Germany, the Netherlands, and Belgium, and Al-Quds Fund for Humanitarian Services in Canada. The Coalition of Benevolence is a product of the 101 Days Campaign initiated by a number of HAMAS front organizations in the Middle East, Europe, and North America.

183. A HAMAS-affiliated website has called for donations to "Al-Aqsa and the brothers in Palestine" through organizations around the world including Interpal, Al-Aqsa Foundation, and CBSP — all members of Qaradawi's coalition. The website also requested donations to be deposited in the account of the "101 days organization" at the Arab Bank's branch in Lebanon. Furthermore, the 101 Days Campaign published a request on its official website that visitors to its website donate to the organization through its accounts in any branch of the Arab Bank. As Stated in French publications in July 2003, the CBSP also holds an account in the Arab Bank.

184. Defendant Arab Bank has also knowingly laundered funds for the HLF, a Texas based "charity" which has raised funds in the United States for HAMAS for more than a decade. Arab Bank, in turn, channeled tens of thousands of dollars for HLF through its New York branch to the Ramallah Charitable Committee, an agent of HAMAS. Arab Bank also knowingly

launders funds raised by Interpal and IRFAN and assists in transferring such funds from the area where the money is raised to HAMAS and its agents for use in Israel, the West Bank and Gaza.

185.   In July 2004, HLF and its officers were criminally indicted in the United States District Court for the Northern District of Texas for providing material support to a designated FTO (HAMAS) – including for specific transactions involving payments made by HLF to the Ramallah Charitable Committee, Tulkarem Zakat Committee, and the Islamic Charity Society of Hebron.

186.   The indictment specifies particular financial transactions initiated by HLF that resulted in monetary transfers to the Ramallah Charitable Committee.

187.   Over 9 years ago, on May 6, 1997, the government of Israel designated HLF as a HAMAS front organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks ...."

188.   On September 25, 1997, the Palestinian Authority closed what it identified as 16 HAMAS institutions and associations. HLF's Gaza office was one of the entities (temporarily) closed by the Palestinian Authority. The closure, including identification of HLF as a targeted HAMAS entity, was detailed in the *Jerusalem Post* on September 28, 1997.

189.   Nonetheless, Arab Bank continued to provide financial services to HLF and Arab Bank's New York branch continued to wire thousands of dollars to the Ramallah Charitable Committee at HLF's behest.

190.   On January 10, 2001, a federal district court in Illinois rendered a decision declining to grant a motion to dismiss in a case initiated by the parents of David Boim, who was killed by a HAMAS terrorist in 1997. The Boims had sued, among others, HLF, for providing material support to HAMAS, a designated FTO.

191. Nonetheless, Arab Bank continued to deposit HLF fund transfers and credit the Arab Bank account of the Ramallah charitable front even after the Boim case placed the defendant on further notice of HLF's criminal activities.

192. Arab Bank provides financial services to agents of HAMAS by maintaining bank accounts for the following designated FTOs affiliated with HAMAS:

      (1)    The Association de Secours Palestinien (ASP) — Arab Bank, Zurich

      (2)    Commite de Bienfaisance et de Secours aux Palestiniens (CBSP) — Arab Bank, Paris

      (3)    Palestinian Association in Austria — Arab Bank, Paris

193. Similarly, the New York branch of the Arab Bank has facilitated the transfer of significant sums to the Tulkarem Charitable Committee despite the fact that in some cases both the "donor" and recipient of the funds had been previously formally designated as "Unlawful Organizations" by the government of Israel.

194. Moreover, following the Israeli army's military operations in the spring of 2002, the government of Israel obtained and subsequently disclosed extensive materials (most of them available on the internet) demonstrating the Tulkarem Charitable Committee's connections to HAMAS.

195. Nonetheless, Arab Bank and its New York branch continued to convert substantial sums of money and forward tens of thousands of dollars from New York to the Tulkarem account of the Tulkarem Charitable Committee at the Arab Bank.

196. Arab Bank has also knowingly laundered funds for Interpal, a London based "charity" which has raised funds in Europe for HAMAS and other terrorists for more than a decade. Arab Bank, in turn, channeled tens of thousands of dollars for Interpal through its New

York branch to various HAMAS zakat committees. Arab Bank has also knowingly laundered and permitted the PIJ to solicit funds on its web site (www.palestineway.com or www.abrarway.com) for its terrorist activities by sending money to various accounts maintained by Arab Bank. Often the account designated is one of the "charitable" front organizations. This demonstrates, among other things, the knowledge of the donors and the Arab Bank that the terror organizations are using the "charitable" entities as fronts to try to mask the true purpose of the contributions. It is clear from the solicitation that money is being sought for military uses and jihad and not humanitarian uses. Arab Bank knows of these solicitations or is willfully blind to them because of its intent and desire to see the goals of jihad succeed.

V.    **Cultivation of the Culture of Death**

197.    As set forth in an internal HAMAS memorandum captured by the Israeli army during a raid of the offices of the Hebron Charitable Committee, HAMAS has arranged for the "transfer [of] large sums" to the charitable committee and other HAMAS front organizations through the "charity activities" of their operatives abroad.

198.    The memorandum emphasizes that HAMAS "require[s] new bank account numbers for money transfers" and promises that the HAMAS will:

> invest efforts to transfer money for the martyrs (the shahids) and prisoners, via the transfer [to] charitable institutions. This is a primary goal in the framework of the effort to transfer aid money to these institutions, so that these budgets are released in the best manner and in order to bring about an improvement in the level of the movement's performance.

The memorandum concludes with the promise that HAMAS will continue to "build up the activities and operations" of its front organizations by, among other things, *"taking advantage of the conditions and the atmosphere of death."*

199.   The financial support provided by the Saudi Committee, Interpal, RLF and IRFAN to HAMAS via the Arab Bank, as well as the accounts maintained by the terror organizations' charitable fronts at Arab Bank, constitutes the backbone of the donor base and operational budgets of HAMAS, and has allowed HAMAS to expand its operations, attract more recruits, and professionalize its financial distribution channels.

200.   Each front organization officially holds itself out to the general public as a charitable organization with a purely humanitarian and benign purpose.  In fact, however, the primary mission of these organizations, which is known and understood by Defendant Arab Bank but fraudulently concealed from regulators, the public, and others, is to raise and launder funds for terrorist organizations and otherwise to coordinate and conduct activities that are essential to the conduct of terrorist operations and to the material support of terrorist operations.  As the Assistant Director of the FBI's Counterterrorism Division, Dale L. Watson, has stated, that crucial financial support for the families of HAMAS suicide bombers assists HAMAS by providing a constant flow of suicide volunteers and buttresses HAMAS's terrorist infrastructure. Further, HAMAS uses the zakat committees to provide needed social services for the Palestinian population, thereby gaining support for HAMAS's activities, including its illegal terrorist attacks against civilians.

201.   By knowingly providing banking and administrative services to "charitable" front organizations that are controlled and directed by designated FTOs, including collecting, transferring, and laundering funds for those organizations through its New York branch, Arab Bank has substantially assisted HAMAS, the PIJ, AAMB, and PFLP in the furtherance of a murderous conspiracy to commit multiple acts of international terrorism and has committed numerous overt acts in furtherance of the conspiracy. Plaintiffs allege that Arab Bank has acted

with knowledge and intent to materially assist and support HAMAS and other terror organizations in this way. This wrongful conduct was approved and ratified by senior executives of the bank and by management level employees of the Defendant.

202.    Indeed, had the doors of Arab Bank not been opened to HAMAS, the PIJ, AAMB, and PFLP during the past five years, the leaders of HAMAS, the PIJ, AAMB, and PFLP would have had to make far more onerous arrangements for transfer of foreign contributions to terrorists within Palestinian-controlled territory and the great bulk of those funds would likely have never reached their destination.

203.    Without the fundraising activity of Interpal, HLF, IRFAN and the Saudi Committee, aided and abetted by Arab Bank, HAMAS and the other terrorist organizations would have not been able to perpetrate the many heinous terror attacks between October 2000 and the present alleged herein.

204.    Defendant Arab Bank collaborated and conspired to commit gross human rights violations, including killing, torturing, tormenting and maiming innocent people.

## VI.    Condemnation of Financing of Terrorism, Genocide and Crimes Against Humanity

### A.    The United States' Condemnation of Financing of Terrorism

205.    The United States government has affirmed the causal effectiveness of cash payments in fomenting acts of terror. A November 2001 Federal Bureau of Investigation memorandum concerning HAMAS funding notes that, through such financial support, "HAMAS provides a constant flow of suicide volunteers and buttresses a terrorist infrastructure heavily reliant on moral support of the Palestinian populaces…"

206.    The United States, at its highest levels, has also specifically condemned the provision of financial support to families of suicide bombers. Former U.S. Secretary of State

Colin Powell stated: "I think it's a real problem when you incentivize in any way suicide bombings." Vice President Richard B. Cheney cited such financial support as a factor for the U.S. military campaign against the regime of Saddam Hussein, noting, in late 2003, that the former Iraqi regime "cultivated ties to terror" by, among other things, "making payments to the families of suicide bombers in Israel." In July 2004, Vice President Cheney similarly criticized Hussein for "providing financial rewards to the families of suicide bombers in Israel." And in July 2004, President George W. Bush said that Hussein "def[ied] the world" by, among other things, "subsidiz[ing] the families of suicide bombers."

207.    On July 27, 2004, the United States criminally indicted the HLF and various other individuals for violations of federal law (including the Anti-Terrorist Act) based on their provision of material support to the families of Palestinian suicide bombers. The specific zakat committees identified in the indictment included, among others, the Tulkarem Charity Committee.   The indictment charges that the defendant "provided financial support to the families of HAMAS martyrs, detainees and activists...[I]n this manner, the defendant effectively rewarded past, and encouraged future, suicide bombings and terrorist activities on behalf of HAMAS." The indictment further stated: "This type of support was critical to HAMAS' efforts to win the hearts and minds of the Palestinian people and to create an infrastructure to solidify HAMAS' presence."

### B.    Universal Condemnation of Financing of Terrorism

208.    The international community has universally condemned the financing of terrorism, thus incorporating this offense into the law of nations.

209.    The following international conventions and/or United Nations Security Council

Resolutions support the premise that the financing of terrorism is incorporated into the law of

nations:

i.      The International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 54/109, U.N. GA OR, 54th Sess., 76th mtg., Supp. No. 49, U.N. Doc. A/Res/53/108 (1999) (In force Apr. 2002).

ii.     Resolution 1267 (1999) of October 15, 1999 on the freezing of the funds and other financial resources of the Taliban.

iii.    Resolution 1269 (1999) of October 19, 1999 calling upon States to take steps to deny those who finance terrorist acts safe haven.

iv.     Resolution 1333 (2000) of December 19, 2000 on the freezing of the funds and other resources of Usama bin Laden and the Al-Qaida organization.

v.      Resolution 1363 (2001) of July 30, 2001 on the establishment of a mechanism to monitor the implementation of measures imposed by Resolutions 1267 (1999) and 1333 (2000).

vi.     Resolution 1373 (2001) of September 28, 2001 on threats to international peace and security caused by terrorist acts, and mandating the formation of the Counter-Terrorism Committee.

vii.    Resolution 1377 (2001) of November 12, 2001 calling upon States to implement fully Resolution 1373 (2001).

viii.   Resolution 1390 (2002) of January 16, 2002 effectively merging the freezing measures of Resolutions 1267 (1999) and 1333 (2000).

ix.     Resolution 1455 (2003) of January 17, 2003 on measures to improve the implementation of the freezing measures of Resolutions 1267 (1999), 1333 (2000), and 1390 (2002).

x.      Resolution 1456 (2003) of January 29, 2003 reaffirming that "measures to detect and stem the flow of finance and funds for terrorist purposes must be urgently strengthened"; stating that States must "bring to justice those who finance... terrorist acts"; and urging States to become parties to the 1999 Terrorism Financing Convention; calling on Counter-Terrorism Committee to intensify efforts to implement Resolution 1373 (2001).

xi.     Resolution 1526 (2004) of January 30, 2004 calling upon States to implement fully Resolution 1373 (2001) and to implement measures to improve the freezing

measures of Resolutions 1267 (1999) and 1333 (2000).

xii.     Resolution 1535 (2004) of March 26, 2004 calling upon States to implement fully Resolution 1373 (2001).

### C.     Universal Condemnation of Genocide

210.    In addition, the international community has universally condemned the crime of

genocide, thus incorporating this offense into the law of nations.

211.    The following international conventions and/or United Nations Security Council

Resolutions support the premise that the crime of genocide is incorporated into the law of

nations:

i.      The Convention on the Prevention and Punishment of the Crime of Genocide ("Convention on Genocide"), 78 U.N.T.S. 277;

ii.     The Statute of the International Criminal Tribunal for the Former Yugoslavia ("Statute of the ICTY"), Art. 4 (adopted by the U.N. Security Council in Resolution No. 808 (May 3, 1993)), U.N. Doc. Sf25704;

iii.    The Statute of the International Criminal Tribunal for Rwanda ("Statute of the ICTR"), Art. 2 (adopted by the U.N. Security Council in Resolution No. 955), U.N. Doc. S/INF/50 (1994); and

iv.     The Rome Statute of the International Criminal Court, U.N. GAOR, 52d Sess., Annex II, at 4, U.N. Doc. A/CONF.183/9 (1998), Art. 6.

### D.     Universal Condemnation of Crimes Against Humanity

212.    The international community has also universally condemned crimes against

humanity, thus incorporating this offense into the law of nations.

213.    The following international conventions and/or United Nations Security Council

Resolutions support the premise that acts constituting crimes against humanity are incorporated

into the law of nations:

i.      The Charter of the International Military Tribunal, Aug. 8, 1945, art. 6I, 59 Stat. 1546, 1547, E.A.S. NO. 472, 82 U.N.T.S. 284;

      ii.     The Statute of the International Criminal Tribunal for the Former Yugoslavia, Art. 5;

      iii.    The Statute of the International Criminal Tribunal for Rwanda, Art. 3;

      iv.    The Rome Statute of the International Criminal Court, Art. 7.

## COUNT ONE - ALIEN TORT CLAIMS ACT CLAIM FOR
## FINANCING OF TERRORISM IN VIOLATION OF THE LAW OF NATIONS

214.    Plaintiffs incorporate herein by reference the allegations contained in the preceding paragraphs.

215.    Article I, section 8 of the Constitution of the United States gives the Congress the power to "define and punish Piracies and Felonies committed on the High Seas, and Offences against the Law of Nations." Congress did just that in 1789 when it passed the Alien Tort Claims Act ("ATCA"), which provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C.A. § 1350.

216.    The acts of international terrorism described above constitute torts within the meaning of the Alien Tort Claims Act, 28 U.S.C. §1350, and are a clear violation of the law of nations, in that they violate international legal norms prohibiting acts of murder, torture and terrorism committed in the pursuit of genocide, war crimes, and crimes against humanity, as well as terrorist financing. FTOs, such as HAMAS, like the pirates and slave traders of the 18th century, are enemies of all mankind. Bombings of innocent civilians that are intended to kill, maim, paralyze and burn innocent civilian men, women, children, and the elderly in their homes, at religious observances, or simply riding in a car or bus or eating a slice of pizza in a pizza parlor, are heinous and depraved acts of barbarity that violate definable, universal international norms.

217.    In light of the nature of the violence committed by HAMAS, the PIJ, AAMB, PFLP, and the other terror organizations that injured or killed Plaintiffs, those organizations and Arab Bank, which knowingly aided and abetted them, earned the description "enemies of the human race."

218.    Defendant Arab Bank aided and abetted and was an accomplice in the planning, preparation, or execution of the crimes described above.  Arab Bank provided organized and systematic financial support, financial incentives, fundraising, money laundering, other practical assistance, encouragement and moral support, all of which substantially aided the perpetration of these crimes.  Arab Bank did so with knowledge that its actions would assist the perpetrators in the commission of theses crimes.  Defendant furthermore violated the law of nations and recognized international legal norms by engaging in terrorist financing.

219.    As a result of Defendant's heinous actions in violation of the law of nations and treaties of the United States, the Plaintiffs suffered injury and damages.  Defendant's aiding and abetting acts of terrorism and terrorist financing in violation of the law of nations and treaties of the United States were the proximate cause of the injuries and damages suffered by Plaintiffs.

220.    The crime of terrorist financing rests on a clear and definite norm of international law that is universally accepted by the civilized world.  The International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 54/109, U.N. GAOR, 54th Sess., 76th mtg., Supp. No. 49, U.N. Doc. AfRes/53/108 (1999) (In force Apr. 2002) ("Convention") declares existing international law.  It has been signed by 132 States, and, as of December 8, 2004, was in force among 117 States.  *See* http://untreaty.un.org/ENGLISHIStatus/ Chapterxviiitreaty11.asp.  The Convention condemns the funding of terrorism and requires that the provision or collection

of funds for terrorist offenses be criminalized. The United States ratified this Convention on June 26, 2002.

221.    The Convention follows the precedents set by numerous other sources of international law that reflect the universal condemnation of terrorist financing.

222.    The Convention defines offenses by incorporating eleven existing anti-terrorism conventions. Thus, a Convention offense includes providing or collecting funds for any act falling within the International Convention for the Suppression of Terrorist Bombings, adopted by the General Assembly of the United Nations Jan. 12, 1998, G.A. Res. 164, U.N. GAOR 52nd Sess., U.N. Doc. A/RES/52/164 (1998), 37 I.L.M. 249 (1998) (In force May 23, 2001) ("Bombing Convention"), which itself has been ratified by 123 nations. The United States ratified the Bombing Convention on June 26, 2002.

223.    Convention offenses also encompass providing or collecting funds for "any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in hostilities in a situation of armed conflict, when the purpose of the act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act."

224.    The Convention supplements existing international authority in the form of U.N. Security Council Resolutions which reflect the international community's collective denunciation of terrorist financing, including the following:

- Resolution 1267 (1999) of October 15, 1999 on the freezing of the funds and other financial resources of the Taliban,

- Resolution 1269 (1999) of October 19, 1999 calling upon States to take steps to deny safe haven to those who finance terrorist acts.

- Resolution 1333 (2000) of December 19, 2000 on the freezing of the funds and other resources of Usama bin Laden and the Al-Qaida organization.

- Resolution 1363 (2001) of July 30, 2001 on the establishment of a mechanism to monitor the implementation of measures imposed by Resolutions 1267 (1999) and 1333 (2000).

- Resolution 1373 (2001) of September 28, 2001 on threats to international peace and security caused by terrorist acts, which mandated the formation of the Counter-Terrorism Committee.

- Resolution 1377 (2001) of November 12, 2001 calling upon States to implement fully Resolution 1373 (2001).

- Resolution 1390 (2002) of January 16, 2002 effectively merging the freezing measures of Resolutions 1267 (1999) and 1333 (2000).

- Resolution 1455 (2003) of January 17, 2003 on measures to improve the implementation of the freezing measures of Resolutions 1267 (1999), 1333 (2000), and 1390 (2002).

- Resolution 1456 (2003) of January 29, 2003 reaffirming that "measures to detect and stem the flow of finance and funds for terrorist purposes must be urgently strengthened"; stating that States must "bring to justice those who finance...terrorist acts"; urging States to become parties to the 1999 Terrorism Financing Convention; and calling on the Counter-Terrorism Committee to intensify efforts to implement Resolution 1373 (2001).

- Resolution 1526 (2004) of January 30, 2004 calling upon States to implement fully Resolution 1373 (2001) and to implement measures to improve the freezing measures of Resolutions 1267 (1999) and 1333 (2000).

- Resolution 1535 (2004) of March 26, 2004 calling upon States to implement fully Resolution 1373 (2001).

225.    U.N. Security Council Resolution 1373 was unanimously adopted under Chapter

VII of the U.N. Charter. Under Article 25, decisions taken by the Security Council under

Chapter VII of the Charter are legally binding on all members.

226.    Resolution 1373 is unequivocally directed at the prevention, prosecution, and

punishment of the financing of terrorism, and characterizes acts of terrorism as threats to

international peace and security. By characterizing acts of terrorism as threats to international

peace and security, the Security Council is entitled to take the collective measures (or "sanctions") envisioned by Chapter VII of the United Nations Charter. The measures that the Council decides to take in these circumstances are mandatory for all the members of the United Nations by virtue of Articles 25 and 48 of the Charter.

227.    Under Resolution 1373, "all States shall...prevent and suppress the financing of terrorist acts" and "criminalize the willful provision or collection, by any means, directly or indirectly, of funds by their nationals or in their territories with the intention that the funds should be used, or in the knowledge that they are to be used, in order to carry out terrorist attacks." States are equally bound to "[e]sure that any person who participates in the financing" of terrorism "is brought to justice." Resolution 1373's prohibition against "acts, methods, and practices of terrorism" which are "contrary to the purposes and principles of the United Nations" – including knowingly financing, planning, and inciting terrorist acts – demonstrates that terrorist financing is contrary to existing Treaty obligations of member States, as expressed in the purposes and principles of the U.N. Charter, which all member States are obliged to honor.

228.    World condemnation of terrorist financing is equally reflected in various regional conventions, which prohibit the financing of terrorist acts. *See* Annex to Resolution No.: 59//26P; 1999 Convention of the Organization of the Islamic Conference on Combating International Terrorism, Art. 3; 1999 OAU Convention on the Prevention and Combating of Terrorism (Algiers, July 14, 1999), Art. 3; 1998 Arab Convention for the Suppression of Terrorism (Cairo, April 1998), Art. 3.

229.    Terrorist financing is likewise defined with a specificity sufficiently comparable to international law violations that were familiar when the ATCA was enacted.

230. Consistent with its condemnation of terrorism financing, the world community has also joined in defining who can be held liable. The Convention explicitly provides that liability for terrorist financing reaches those that directly or indirectly provide or collect funds with the intention or knowledge that the funds will be used to carry out a defined terrorist offense, regardless of whether the funds were actually used. Specifically, the Convention reaches every accomplice and every person who organizes or directs others in the terrorist financing effort.

231. Furthermore, legal entities may be held civilly liable for the offenses set out in the Convention. This comports with the general international consensus embodied in the Bombing Convention, which also reaches all persons who "participate[] as an accomplice" in a terrorist bombing or "organize[] others to commit them or in any other way contribute[] to their commission."

232. Arab Bank aided and abetted, intentionally facilitated, and/or recklessly disregarded a violation of international law, to wit, terrorist financing, by directly or indirectly providing funds to PIJ, HAMAS, AAMB, and PFLP with the intention or knowledge that those funds would be used to carry out an offense as defined by the Convention, the Bombing Convention and international law:

> i. Starting on or about October, 2000, PIJ, HAMAS, AAMB, and PFLP engaged in numerous terrorist bombings that were part of a systematic and widespread attack on a civilian population, in which they murdered and seriously injured Plaintiffs and several thousand innocent civilians, in furtherance of the overarching goal of toppling Israel and persecuting and completely destroying Plaintiffs and the Israeli population.

ii. The suicide bombings and other murderous attacks committed by PIJ, HAMAS, AAMB, and PFLP were intended to cause death or serious or serious bodily injury to Plaintiffs and other civilians not taking part in any hostilities or armed conflict. By their nature and context, suicide bombings and other murderous attacks are designed to destroy and intimidate the Israeli population and to topple Israel, as evidenced by the professed goals of PIJ, HAMAS, AAMB, and PFLP.

iii. Arab Bank regularly: accepted millions of dollars in deposits from State-sponsored charities, official State donations, and private contributions with actual knowledge and awareness that these same funds were raised and deposited for the sole purpose of supporting Palestinian genocidal murderers and maimers and their families; routed these same deposits into bank accounts created and maintained by government mandate and official government policy; transferred funds from those accounts to other participating banks; and disbursed those funds to, among others, Palestinian genocidal murderers and maimers and their families, as well as the families of prisoners who were members of PIJ, HAMAS, AAMB, and PFLP and who engaged in suicide bombings against Plaintiffs and other Israeli civilians.

iv. At all times, Arab Bank knew that its receipt, transfer, and disbursement of Account 98 funds were being paid to families of members of PIJ, HAMAS, AAMB, and PFLP, and that these same FTOs carried out suicide bombings and other murderous attacks against Plaintiffs and other Israeli and non-Israeli civilians.

v. At all times, Arab Bank knew that the Account 98 funds and monetary awards that it transferred and distributed to the relatives of suicide bombers were twice as

large as those given to relatives of mere prisoners and that those substantial monetary rewards provided an incentive to PIJ, HAMAS, AAMB, and PFLP members to engage in suicide bombings.

vi. Arab Bank's conduct further provided organizational incentives to PIJ, HAMAS, AAMB, and PFLP to continue to plan, and operate suicide bombings. Given the evidence that the Saudi Committee Account 98 funds were earmarked for the families of prisoners and those killed while perpetrating terrorist attacks, Arab Bank incentivized and contributed to suicide bombings.

vii. Arab Bank knew that the Account 98 funds that were raised, deposited, transferred, and disbursed through a system it helped to develop materially contributed to the creation of a self-sustaining system of terrorist financing, suicide bombings, and other murderous attacks.

viii. Therefore, Arab Bank aided and abetted, intentionally facilitated, and/or recklessly disregarded a violation of international law within the meaning of the Convention, the Bombing Convention, and the law of nations by engaging in terrorist financing.

233.   Plaintiffs and their family members suffered death or serious physical and/or mental injuries as a proximate result of Arab Bank's conduct, for which they now sue.

### COUNT TWO - ALIEN TORT CLAIMS ACT CLAIM FOR AIDING AND ABETTING, COMPLICITY IN, PARTICIPATING IN, CONSPIRING TO COMMIT, ATTEMPTING TO COMMIT, AND INCITING ACTS OF GENOCIDE IN VIOLATION OF THE LAW OF NATIONS

234.   Plaintiffs incorporate herein by reference the allegations contained in the preceding paragraphs.

235.    Genocide has also been universally recognized as a violation of a clear and definite norm of international that is universally accepted by the civilized world.  Genocide is so widely condemned that it has achieved the status of *jus cogens* violation, and, therefore, is a violation of the law of nations such that the commission of genocide by a party subjects it to liability to aliens in United States courts under the ATCA.

236.    The Convention on the Prevention and Punishment of the Crime of Genocide ("Convention on Genocide"), 78 U.N.T.S. 277, adopted in 1948 and ratified by more than 136 nations, defines "genocide" as: "[a]ny of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial, or religious group, as such: (a) killing members of the group; (b) causing serious bodily injury or mental harm to members of the group; (c) deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part." The Convention goes on to note that "persons committing genocide shall be punished, whether they are constitutionally responsible rulers, public officials or private individuals."

237.    The most recent examples of the re-adoption of the Convention on Genocide's standard definition of genocide by the international community, including the United States, are the statutes concerning the International Criminal Tribunal of the Former Yugoslavia ("ICTY") and the International Criminal Tribunal for Rwanda ("ICTR"). *See* Statute of the International Criminal Tribunal for the Former Yugoslavia ("Statute of the ICTY"), Art. 4 (adopted by the U.N. Security Council in Resolution No. 808 (May 3, 1993)), U.N. Doc. S/25704; Statute of the International Criminal Tribunal for Rwanda ("Statute of the ICTR"), Art. 2 (adopted by the U.N. Security Council in Resolution No. 955), U.N. Doc. S/INF/50 (1994).  The definition contained within the Statute of the ICTY and the Statute of the ICTR expand upon that articulated by the

114176.v1                                    89

Convention on Genocide by criminalizing conduct that "[i]mpos[es] measures intended to prevent births within the group" and "[f]orcibly transferring children of the group to another group."

238.    The international community also adopted this expanded definition of genocide in the Rome Statute of the International Criminal Court ("The Rome Statute"). *See* The Rome Statute, U.N. GAOR, 52d Sess., Annex II, at 4, U.N. Doc. A/CONF.183/9 (1998), Art. 6.  The Rome Statute has not been ratified by the United States for reasons unrelated to the definition of genocide; however, its adoption of definitions universally accepted within the international community through the Statute of the ICTY and the Statute of the ICTR shows how this definition of genocide has become part of the "law of nations."

239.    The international community has also recognized the crime of genocide through the International Covenant on Civil and Political Rights ("ICCPR"), adopted for signature, ratification and accession by General Assembly resolution 2200A (XXI) of December 16, 1966, and entered into force in accordance with Article 49 on March 23, 1976.  The ICCPR, to which both Israel and the United States are parties (together with most civilized nations), specifically states in Article 6 that "[n]o one shall be arbitrarily deprived of his life." Article 20 further states that "[a]ny advocacy of national, racial, or religious hatred that constitutes incitement to discrimination, hostility or violence shall be prohibited by law."

240.    Furthermore, on November 4, 1988, the Genocide Convention Implementation Act of 1987 (the Proxmire Act), Pub. L. 100-606, was signed into law by President Ronald Reagan.  As stated in the text of Senate Resolution 307 (107th Congress, 2nd Session), by this action, the United States Code (18 U.S.C. § 1091) was amended "to criminalize genocide under the United States law." Senate Resolution 307 further called upon "the people and Government

of the United States to rededicate themselves to the cause of bringing an end to the crime of genocide (as postulated under international law and with passage of this act under US law)."

241.    Genocide is defined with a specificity sufficiently comparable to international law violations that were familiar when the ATCA was enacted.  Genocide is therefore a violation of the Law of Nations actionable under the ATCA for private actors.  *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) (cited approvingly in *Sosa v. Alvarez-Machain*, 124 S.Ct. 2739, 2766 n.20 (2004)).

242.    The campaign of terror carried out by terrorist organizations with the assistance of Defendant against Jews is nothing short of a genocidal campaign of terror.

243.    HAMAS' founding charter, titled "Mithaq Harakat al-Muqawamah al-Islamiyya" and dated August 18, 1988, pledges to carry out armed struggle in order to destroy Israel and its Jewish citizens and to establish an Islamic Palestinian State in place of Israel.  This genocidal ideology is laid out in a hadith – a traditional recitation of the sayings of the Prophet Mohammad and his companions not recorded in the Quran – which was adopted as Article 7 of HAMAS's charter.  That haditha reads: "The time will not come until Muslims will fight the Jews (and kill them); until the Jews hide behind rocks and trees, which will cry: O Muslim! The Jew is hiding behind me, come on and kill him!"

244.    HAMAS's genocidal objectives are also set forth elsewhere in its Charter.  For example, Article 8, the slogan of the HAMAS movement, states: "Allah is its goal, the Prophet its model, the Qur'an its Charter, jihad its path, and death for the cause of Allah its most sublime belief."

245.    Article 13 States: "There is no solution for the Palestinian question except through jihad. All initiatives, proposals and international conferences are a waste of time and vain endeavors."

246.    Article 28 States: "Israel, Judaism and Jews challenge Islam and the Muslim people: 'May the cowards never sleep.'"

247.    After his release from an Israeli prison and return to Gaza in October 1997, Sheikh Ahmed Yassin, the founder and spiritual head of HAMAS, declared that Israel must "disappear from the map." He added: "[W]e have an aim and an enemy, and we shall continue our jihad against the enemy. A nation without a jihad is a nation without a purpose."

248.    Abdel Majeed Shoman, chairman of the Arab Bank, was interviewed in the Jordanian newspaper *Al-Dustour* in July 2000. In this interview, Shoman echoed the views of Yassin and was quoted as stating, "for him a just solution would be the return of all Palestinian lands to their legitimate historical residents, *i.e.*, the Palestinian people and the Arab nation." Shoman said he was against a Palestinian compromise based on "a partial return [which included] the loss of some land, and that the Jews had no right to the land of Palestine."

249.    The U.S. Department of Justice has described HAMAS's charter as stating "that the purpose of HAMAS is to create an Islamic Palestinian State throughout Israel by eliminating the State of Israel through violent jihad...HAMAS is opposed to any peaceful solution to the Palestinian territorial conflict, as such a proposition is at odds with HAMAS's stated goal of annihilating the State of Israel...."

250.    With the outbreak of the second intifada, HAMAS and other Palestinian terrorist organizations – notably PIJ, the AAMB, and the PFLP – intensified the terror campaign of widespread and systematic suicide bombings and other murderous attacks within Israel, the West

Bank and Gaza. Like HAMAS, PIJ, AAMB, and PFLP are similarly committed to the destruction of the State of Israel. According to some estimates, attempted attacks since 2000 have numbered approximately 25,000 and have targeted Jews and other civilians, resulting in the death and injury of thousands of individuals, mostly civilians.

251. HAMAS, PIJ, AAMB, and PFLP are engaged in a campaign of genocide. These groups have killed citizens and non-citizens of the State of Israel and have caused serious bodily injury and mental harm to citizens and non-citizens of the State of Israel with the intent to destroy the State of Israel. These acts fit squarely within the well-settled international law definition of genocide as set forth in the Genocide Convention.

252. Article 3 of the Convention on Genocide notes that among the acts which are punishable are "(a) Genocide; (b) Conspiracy to commit genocide; (c) Direct and public incitement to commit genocide; (d) Attempt to commit genocide; and (e) Complicity in genocide."

253. The concept of complicit liability for conspiracy or aiding and abetting is well-developed in international law. Under international law, one is responsible for a crime which is committed when that party provides "knowing practical assistance or encouragement which has a substantial effect on the perpetration of the crime."

254. Under the Allied Control Council Law No. 10 (Dec. 20, 1945), criminal liability extends not only to principals who committed acts of genocide or war crimes but also to those who were connected with any plans or enterprises involving the commission of such crimes.

255. Under The Agreement for the Prosecution and Punishment of Major War Criminals of the European Axis, and Establishing the Charter of the Military Tribunal, 82 U.N.T.S. 279, "leaders, organizers, instigators, and accomplices participating in the formulation

or execution of a common plan or conspiracy to commit any of the foregoing crimes are responsible for all acts performed by any persons in execution of such a plan."

256.    Cases emanating from the ICTY and the ICTR have confirmed that aiding and abetting is a concept duly ingrained in international law to provide a colorable claim pursuant to the jurisdiction conferred by the ATCA.

257.    In 1793, President George Washington himself proclaimed that "whatsoever of the citizens of the United States shall render himself liable for punishment...under the law of nations, by committing, aiding or abetting hostilities...will not receive the protection of the United States against such punishment."

258.    In 1795, the Attorney General of the United States echoed George Washington's proclamation: "The government does not seem bound to do more than has already been done by the President, who, by his proclamation of the 22nd of April, 1793, warned all citizens of the United States against all such proceedings" and went on to cite the proclamation.

259.    In 1807, chief Justice Marshall wrote in the famous opinion of *Ex Parte Bollman* and *Ex Parte Swartwout* concerning the trial of two of Aaron Burr's co-conspirators that: "if war be actually levied, that is, if a body of men be actually assembled for the purpose of effecting by force a treasonable purpose, all those who perform any part, however minute, or however remote from the scene of the action, and who are actually leagued in the general conspiracy, are to be considered as traitors."

260.    The Comments to the Restatement (Second) of Torts § 876 state, "Advice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance. If the encouragement or assistance is a substantial factor in causing the

resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act."

261. Arab Bank aided and abetted, attempted to commit, was complicit in, participated in, conspired to commit, and incited the planning, preparation or execution of genocide. Arab Bank did so by providing organized and systematic financial and other practical assistance, encouragement, and moral support to terrorists, all of which had a substantial effect on the perpetration of genocide. The Bank engaged in this unlawful conduct with knowledge that its actions would assist HAMAS, PIJ, AAMB, and PFLP in the commission of genocide.

262. Plaintiffs and their family members suffered death or serious physical and/or mental injuries as a proximate result of Arab Bank's conduct, for which they now sue.

## COUNT THREE - ALIEN TORT CLAIMS ACT CLAIM FOR AIDING AND ABETTING CRIMES AGAINST HUMANITY IN VIOLATION OF THE LAW OF NATIONS

263. Plaintiffs incorporate herein by reference the allegations contained in the preceding paragraphs.

264. The suicide bombings and other murderous attacks committed against Plaintiffs and the unarmed Israeli population constitute a crime against humanity in violation of the law of nations.

265. Strong condemnation of crimes against humanity rests on a clear and definite norm of international law which is universally accepted by the civilized world. *See e.g.,* Charter of the International Military Tribunal, Aug. 8, 1945, art. 61, 59 Stat. 1546, 1547, E.A.S. NO. 472, 82 U.N.T.S. 284; Statute of the ICTY, Art. 5; Statute of the ICTR, Art. 3; *see also* The Rome Statute, Art. 7; ICCPR, Art. 20.

266.    Crimes against humanity are defined with a specificity comparable to international law violations that were familiar when the ATCA was enacted. The core elements of a crime against humanity in violation of international law, as codified in the above sources and recognized in international law generally, are murder and other heinous acts against human life, physical welfare, and dignity that are undertaken as part of a widespread or systematic attack against a civilian population. These crimes are punishable whether committed in peacetime or in war.

267.    Starting on or about October 2000, PIJ, HAMAS, AAMB, and PFLP engaged in numerous suicide bombings and other murderous attacks that were part of a systematic and widespread attack on a civilian population.    By means of these attacks, these terrorist organizations murdered and seriously injured Plaintiffs and several thousand innocent Israeli civilians and foreign visitors to Israel in furtherance of the overarching goal of toppling Israel and persecuting and completely destroying Plaintiffs and the Israeli population.

268.    The suicide bombings and other murderous attacks committed by PIJ, HAMAS, AAMB, and PFLP were perpetrated systematically. The suicide bombings and other murderous attacks required a high degree of planning, coordination, funding, and orchestration by and among PIJ, HAMAS, AAMB, PFLP and others, including Arab Bank. Suicide bombings and other murderous attacks also involve recruitment, the provision of explosives, the targeting of Plaintiffs and other members of the Israeli civilian population, and payments to families of suicide bombers.

269.    The suicide bombings and other murderous attacks committed by PIJ, HAMAS, AAMB, and PFLP were widespread in nature.  Plaintiffs and the entire Israeli civilian population were targeted and thousands of unarmed innocents were injured or killed.  Suicide bombings and

other murderous attacks have taken place in public and private locations, during the day and night, and have involved attacks against men, women and children.  In addition to the suicide bombings that were carried out, hundreds of similar suicide bombings have been thwarted prior to implementation.

270.    The suicide bombings and other murderous attacks committed by PIJ, HAMAS, AAMB, and PFLP therefore constitute violations of the law of nations, as they are crimes against humanity.

271.    Arab Bank knowingly, intentionally and directly aided and abetted, intentionally facilitated, and/or recklessly disregarded crimes against humanity in violation of the law of nations.  Aiding and abetting is actionable claims pursuant to the ATCA.

272.    Arab Bank helped to develop the financial system that provided monetary incentives to members of PIJ, HAMAS, AAMB, and PFLP to engage in crimes against humanity.

273.    Arab Bank regularly: accepted millions of dollars in deposits from State-sponsored charities, official State donations, and private contributions with actual knowledge and awareness that these same funds were raised and deposited for the sole purpose of supporting Palestinian genocidal murderers and maimers and their families; routed these same deposits into bank accounts created and maintained by government mandate and official government policy; transferred funds from those accounts to other participating banks; and disbursed those funds to, among others, Palestinian genocidal murderers and maimers and their families, as well as relatives of prisoners who were members of PIJ, HAMAS, AAMB, and PFLP and who committed crimes against humanity against Plaintiffs, other Israeli civilians and foreign visitors to Israel.

274.   At all times, Arab Bank knew that the Account 98 funds that it received and disbursed were being paid to the relatives of members of the PIJ, HAMAS, AAMB, and PFLP, and that these same militants carried out indiscriminate suicide bombings and other murderous attacks against Plaintiffs, other Israeli civilians and foreign visitors to Israel.

275.   Arab Bank aided and abetted, intentionally facilitated and/or recklessly disregarded the planning, preparation or execution of crimes against humanity by providing organized and systematic financial and other practical assistance, encouragement or moral support which had a substantial effect on the perpetration of crimes against humanity with knowledge that its actions would assist HAMAS, PIJ, AAMB, and PFLP in the commission of crimes against humanity.

276.   Plaintiffs and their family members suffered death or serious physical and/or mental injuries as a proximate result of Arab Bank's conduct, for which they now sue.

## LIMITATIONS AND RELATED ISSUES

277.   Because of the serious nature of the offense, there is *no* statute of limitations for ATCA claims based on violations of international law.

278.   To the extent any statute of limitations should be applied here, however, uniform case law holds that the statute of limitations for ATCA offenses is no less than ten (10) years. In any event, any limitations period applicable to Plaintiffs' claims began to run only when Plaintiffs could reasonably have discovered Arab Bank's participation in the terrorist financing alleged herein. For a variety of reasons, it was impossible for Plaintiffs to discover facts sufficient to establish their claims against Arab Bank until shortly before they filed their Complaint.

279.   In part, any statute of limitations applicable to Plaintiffs' claims was tolled by because Arab Bank took substantial steps to mislead Plaintiffs, bank regulators and the general public concerning the Bank's role in the misconduct alleged herein.

280.   For example, Arab Bank has long denied and continues to deny that it controlled and possessed assets earmarked for the families of suicide bombers and terrorist attackers. Arab Bank also refuses to admit its role in developing the Account 98 system that financed and incentivized the attacks on Plaintiffs in violation of the law of nations. Moreover, it was impossible for Plaintiffs to learn the critical facts of Arab Bank's involvement in the terrorist attacks forming the basis of this suit absent cooperation from the bank. Such conduct clearly suffices to establish the foundational elements for equitable tolling.

281.   Throughout the course of the Second Intifada, Arab Bank has also made substantial efforts to conceal its participation in the illicit financing of terrorism and other misconduct alleged by Plaintiffs. Those efforts at concealing the Bank's participation in terrorism financing were necessitated by the fact that the Bank is a highly regulated financial institution with substantial assets. Thus, it was necessary for Arab Bank to conceal its misconduct both from potential claimants and the government bodies that regulate the Bank's conduct.

282.   For example, while Arab Bank has made numerous transfers from various Arab Bank accounts to accounts controlled by terrorist fronts, Arab Bank has not reported those transfers to governmental and regulatory authorities, as was required by law at the time those transfers were made. Nor has the Bank made public its support of terrorist front organizations.

283.   On or about February 25, 2005, the U.S. Office of the Comptroller of the Currency ("OCC"), which regulates the Arab Bank's New York branch, announced drastic

restrictions on Arab Bank's New York operations because of these acts and omissions by the Bank. The OCC determined that the branch "had internal control weaknesses, particularly with regard to its international funds transfer activities." The OCC also found that "the inadequacy of the Branch's controls over its funds transfer business is especially serious in light of the high risk characteristics of many of the transactions." www.occ.treas.gov/ftp/eas/ea2005-14.pdf. During an investigative audit by the OCC of Arab Bank in late 2004 and early 2005, U.S. officials discovered, among other things, that Arab Bank had as customers 40-60 supported terrorists and terrorist groups with alleged connections to such foreign terrorist organizations as Al Qaeda, HAMAS, and Hezbollah. The investigative audit also revealed that Arab Bank knowingly and illegally allowed such groups to transfer money through Arab Bank's New York branch in violation of the laws of the United States. The Arab Bank has entered into a Consent Decree with the OCC regarding restrictions on its operations, and, in August 2005, Arab Bank was forced to pay a \$24 million fine to the United States for its failure to comply with OCC regulations.

284.   Prior to the August 2005 consent decree, Arab Bank had been able to conceal its participation in the financing of terrorism by refusing to comply with banking regulations. It also concealed its participation in the scheme by not allowing the Saudi Committee and other sponsors of terrorism to locate their offices at Arab Bank facilities although the Bank has supplied material support for those organizations. Arab Bank has also, from time to time, caused its name to be omitted from various web site solicitations for funds to finance terrorism in the Middle East. Arab Bank also issued press statements in late 2004 claiming it "practices the highest professional banking standards in Palestine, New York...and around the world." The Central Bank of Jordan, which regulates Arab Bank, and the Jordanian Banking Association both

issued press releases asserting that Arab Bank was in compliance with standard professional practices concerning terror financing.

285.   Plaintiffs made reasonable efforts to determine the identities of those involved in the attacks that injured them.   Until recently, however, it was impossible for Plaintiffs to determine that Arab Bank, contrary to its false and fraudulent public statements, had actively and intentionally participated in the wrongdoing alleged herein.

286.   Indeed, until recently, Arab Bank's illicit conduct remained unknown even to American banking regulators, although those regulators had unfettered access to Arab Bank's records.

287.   Furthermore, much of the information upon which Plaintiffs' claims are based was uncovered only in connection with the seizure of records belonging to Arab Bank and others by the Israeli military. It was not possible for Plaintiffs to uncover that information until shortly before they asserted their claims.

288.   Thus, Plaintiffs undertook reasonable efforts to discover their claims against Arab Bank but were prevented from doing so until shortly before they initiated this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

a) Accept jurisdiction over this action;

b) Enter judgment against Defendant and in favor of each Plaintiff for all compensatory and other damages in such amounts for each named Plaintiff as are allowed by applicable law and as shall be determined at trial;

c) Enter judgment against Defendant and in favor of each Plaintiff for treble damages or other exemplary or punitive damages;

d) Enter judgment against Defendant and in favor of each Plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees;

e) Order any such equitable relief to which Plaintiffs might be entitled; and

f) Grant such other and further relief as the interests of justice may require, including leave to amend this complaint as may permit justice to be served on behalf of each Plaintiff against Defendant as are or may be hereafter named herein.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: August 9, 2006

SHALOV STONE & BONNER LLP

By: _James P. Bonner_

James P. Bonner (JB-0629)
485 Seventh Avenue, Suite 1000
New York, New York 10018
(212) 239-4340

SAYLES WERBNER P.C.
Mark S. Werbner
Eric D. Pearson
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 939-8700

**THE DAVID LAW FIRM, P.C.**
Jonathan David
10655 Six Pines Drive
Suite 260
Woodlands, Texas  77380
(281) 296-9090

Counsel for Plaintiffs